**PHILIPS CREDIT CORPORATION,**
**Plaintiff,**

v.

**REGENT HEALTH GROUP, INC.**
**and Sugar Mill Point Medical**
**Center, Ltd., Defendants.**

**No. 90 Civ. 2838 (DNE).**

United States District Court,
S.D. New York.

Jan. 31, 1997.

Nixon, Hargrave, Devans & Doyle, New York City (Frank H. Penski and Kermitt J. Brooks, of counsel), for plaintiff.

Coudert Brothers, New York City (Darrell Prescott and Jeffrey M. Cohen, of counsel), for defendants.

*OPINION & ORDER*

EDELSTEIN, District Judge:

This is a declaratory judgment action instituted by plaintiff commercial lender seeking a determination that it has no contractual obligation to make two loans to defendant based on alleged oral statements. In their answer to plaintiff's complaint, defendants raise six counterclaims in opposition to plaintiff's cause of action. Plaintiff moves this Court for summary judgment on their Complaint, and defendant opposes this motion on grounds that triable issues of fact exist on both plaintiff's cause of action and defendant's counterclaims. For the following reasons, this Court finds that plaintiff's motion should be granted in its entirety.

*PARTIES*

Plaintiff Philips Credit Corporation ("Philips" or "PCC") is "engaged in the business of commercial lending, but only in very limited markets." (Memorandum of Law of Philips Credit Corporation in Support of Motion for Summary Judgment, *Philips Credit Corp. v. Regent Health Group, Inc.*, 90 Civ. 2838 ("Pltf.Memo") at 2 (Aug. 1, 1994); see, (Complaint, *Philips Credit Corp. v. Regent Health Group, Inc.*, 90 Civ. 2838 ("Complaint") ¶ 5 (April 27, 1990).) PCC is organized under the laws of Delaware, and has its principal place of business in New York, New York. (Complaint ¶ 1); see (Answer and Counterclaim, *Philips Credit Corp. v. Regent Health Group, Inc.*, 90 Civ. 2838 ("Answer") ¶ 1 (June 29, 1990).)

Defendant Regent Health Group, Inc. ("Regent") is "engaged in the development, ownership and management of medical and surgical hospitals." (Affidavit of Brent W. Jorgeson, *Philips Credit Corp. v. Regent Health Group, Inc.*, 90 Civ. 2838 ("Jorgeson Aff.") ¶ 2 (Sept. 29, 1990).) Regent, a Texas corporation headquartered in Austin, Texas, (Regent Health Group Inc.'s Memorandum of Law in Opposition to Philips Credit Corporation's Second Motion for Summary Judgment, *Philips Credit Corp. v. Regent Health Group, Inc.*, 90 Civ. 2838 ("Dfts.Memo") at 2 (Sept. 28, 1994)), was formed in August 1988 by Brent W. Jorgeson ("Jorgeson"). (Jorge-

son Aff. ¶ 3.) Jorgeson has served as Regent's Chairman and President since its founding. *Id.* ¶ 1.

Defendant Sugar Mill Point Medical Center, Ltd. ("Sugar Mill" or "SMPMC") was intended by Regent to be formed as a Texas limited partnership for the purpose of acquiring property in Houma, Louisiana, and constructing a hospital to be known as the Sugar Mill Point Medical Center. (Dfts.Memo at 9–10 & n. 11); (Pltf.Memo at 3); (Jorgeson Aff. ¶ 9.) The SMPMC project "was initiated by several physicians in the Houma area, including Dr. Barry Shelby, M.D. ("Shelby"), because [they] saw a need for a hospital in order to serve adequately the needs of their patients." (Dfts.Memo at 15.) Approximately twenty local physicians in the Houma area "committed to invest a total of approximately $1 million as limited partners as part of the equity for the project." (Dfts.Memo at 10.) According to Regent, "[a]ll elements of the SMPMC financing ... were planned to close concurrently with the closing of a loan from PCC." *Id.* Because "there was no closing on the PCC loan," however, SMPMC was never formed. *Id.;* (Jorgeson Aff. ¶ 9); *see* (Pltf.Memo at 3–4.)

## PRIOR PROCEEDINGS

Plaintiff commenced this diversity action in April 1990, seeking "a judgment declaring that there exists no valid, enforceable contractual obligation" between plaintiff and defendants. (Complaint, ¶¶ 4, 17.) Defendants filed an Answer containing six counterclaims on July 29, 1990. (Answer.) On August 17, 1990, prior to discovery, PCC moved for summary judgment on its complaint on the grounds that no triable issue of fact existed regarding the lack of contractual obligations between the parties. (Pltf.Memo at 15.) On November 12, 1991, this Court denied PCC's motion for two reasons: (1) the parties had not had opportunity to conduct discovery; and (2) genuine issues of material fact existed regarding several elements of both plaintiff's claim and defendants' counterclaims. Order, *Philips Credit Corp. v. Regent Health Group, Inc.,* 90 Civ. 2838 ("November Order") at 1–2 (Nov. 12, 1991).

Following discovery, plaintiff requested this Court's permission to file a second motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 ("Rule 56"). This Court granted plaintiff's request, (Pltf.Memo at 1); (Dfts.Memo at 7), and the instant motion was filed on August 22, 1994. (Notice of Motion, *Philips Credit Corp. v. Regent Health Group, Inc.,* 90 Civ. 2838 (Aug. 22, 1994) ("Notice of Motion").)

## FACTS

The facts underlying plaintiff's motion are lengthy, detailed, and consist of numerous pieces of correspondence between the parties. For organizational purposes, this Court will recite the facts chronologically, in five parts: (1) defendants' preliminary financing efforts; (2) PCC and Regents' negotiations prior to the issuance of commitment letters; (3) PCC's first commitment letter; (4) events subsequent to the issuance of PCC's first commitment letter; and (5) PCC's second commitment letter.

### I. Defendant's Preliminary Financing Efforts

In 1989, Shelby initiated a meeting with Jorgeson regarding the possibility of building a new hospital in Houma, SMPMC. (Deposition of Dr. Barry Shelby, M.D., *Philips Credit Corp. v. Regent Health Group, Inc.,* 90 Civ. 2838 ("Shelby Dep.") at 7 (Mar. 26, 1993)); (Dfts.Memo at 15–16.) Jorgeson and Regent then prepared a financial plan for the development of SMPMC. (Jorgeson Aff. ¶ 15); (Dfts.Memo at 15.) Health Finance Corporation ("HFC"), an investment banking firm headquartered in Houston, Texas, "issued a commitment to provide $5 million to finance the purchase of medical equipment for SMPMC." (Jorgeson Aff. ¶ 15); (Dfts.Memo at 14–16.) In addition, by June 1989, approximately twenty Houma-area physicians had committed to invest a total of approximately $1 million as limited partners of the project. (Jorgeson Aff. ¶ 15); (Dfts.Memo at 10.)

Also in early 1989, Jorgeson and Regent were introduced to representatives of PCC as a result of the efforts of Veech Canon & Associates ("VCA"), a financial consulting firm specializing in the development of ra-

diology/imaging departments for hospitals. (Jorgeson Aff. ¶ 16); (Dfts.Memo at 16); (Pltf.Memo at 4.) In May 1989, Jorgeson, Patrick McKinney ("McKinney"), a national sales manager of PCC, and representatives of VCA and HFC met to discuss whether PCC would be interested in providing all or part of the financing for SMPMC. (Jorgeson Aff. ¶¶ 16–17); (Dfts.Memo at 17); (Pltf.Memo at 4.) At the close of this meeting, McKinney stated that J. Walter Corcoran ("Corcoran"), the President of PCC, would need to make an on-site visit to Houma to investigate the SMPMC plan before a decision could be made by PCC regarding its decision to provide financing for SMPMC. (Jorgeson Aff. ¶ 17); (Dfts.Memo at 17.) On June 13, 1994, Corcoran, McKinney, Jorgeson, representatives of VCA and HFC, and thirteen of the physician partners of the SMPMC project met in Houma to discuss the project ("the June Meeting"). (Jorgeson Aff. ¶ 18); (Dfts.Memo at 17); (Plaintiff's Statement Pursuant to Rule 3(g), *Philips Credit Corp. v. Regent Health Group, Inc.,* 90 Civ. 2838 ("Pltf. 3(g) Stmt.") ¶ 5 (Aug. 1, 1994).)

## II. PCC and Regents Negotiations Prior to the Issuance of Commitment Letters

Following the June Meeting, Corcoran wrote to Jorgeson stating that PCC "is interested in providing you with the financing requirements you may have. However, before formal credit approval can be granted," PCC required detailed financial information and documentation regarding Regent and the SMPMC project. (Letter from J. Walter Corcoran, President, Philips Credit Corp., to Brent W. Jorgeson, President, Regent Health Group, Inc. (June 21, 1989) ("June 1989 Letter").)

Regent provided PCC the information requested. (Jorgeson Aff. ¶ 19); (Letter from Brent W. Jorgeson, President, Regent Health Group, to J. Walter Corcoran, President, Philips Credit Corp. (July 3, 1989).) On July 7, 1989, Jorgeson and another Regent representative Steven Bell ("Bell") travelled to PCC's offices in New York to meet with McKinney "to negotiate the terms and conditions regarding the Sugar Mill transac-

tion in Houma, Louisiana between Regent Health Care and PCC." (Memorandum to J. Walter Corcoran from W.G. Blieberg (June 29, 1989); (Jorgeson Aff. ¶ 20); (Dfts.Memo at 20.) According to defendants,

> [b]y the end of the meeting, PCC and Regent had reached agreement on the major terms of the transaction. Mr. McKinney stated that the terms agreed to during that meeting would be presented to the PCC Credit Committee for approval, and that he and Mr. Corcoran had decided to recommend to the Credit Committee that PCC finance the entire project. Mr. McKinney stated that if the Credit Committee approved the transaction, that would constitute a "formal commitment" by PCC to do the transaction on those terms.

(Jorgeson Aff. ¶ 22); *see* (Dfts.Memo at 20.)

Defendants explain that that same day, Jorgeson and Bell also met with various individuals on PCC's Credit Committee. (Jorgeson Aff. ¶ 24); (Dfts.Memo at 22.). Jorgeson states that "[a]fter meeting with these individuals, Mr. Mckinney informed Mr. Bell and me that the project would be submitted to the PCC Credit Committee the following week and that, if approved, PCC would prepare a written document which would reflect the terms of the transaction as approved by the Credit Committee." (Jorgeson Aff. ¶ 24); *see* (Dfts.Memo at 22.)

Defendants state that on July 13, 1989, PCC's Credit Committee approved the SMPMC financing. (Jorgeson Aff. ¶ 25); *see,* (Dfts.Memo at 22–25.) On July 14, 1989, Wynn Blieberg ("Blieberg") telephoned Jorgeson at Regent's office in Texas to inform Jorgeson that the "the transaction had been approved by the [PCC] Credit Committee on the terms that had been previously discussed with Regent." (Affidavit of Wynn G. Blieberg, *Philips Credit Corp. v. Regent Health Group, Inc.,* 90 Civ. 2838 ("Blieberg Aff.") ¶ 6 (Sept. 27, 1990)); *see* (Dfts.Memo at 25.) Blieberg then orally "set forth the general terms which had been approved by the Credit Committee." (Blieberg Aff. ¶ 6); *see,* (Dfts.Memo at 26.)

On July 17, 1989, Blieberg "prepared a memorandum setting forth the terms as pre-

sented to and approved by the Credit Committee ... on behalf of the Credit Committee." (Blieberg Aff. ¶ 7); *see* (Dfts.Memo at 29); (Memorandum from Wynn Blieberg to Sandra Karriem ("Blieberg Memo") (July 17, 1989).) The Blieberg Memo lists the terms of financing for both the equipment and the mortgage for SMPMC, then instructs the PCC legal department to "prepare a commitment letter for this transaction as soon as possible" for transmission to Jorgeson. *Id.* at 1–2. The Memo then states that "upon return of the commitment letter, the customer is required to remit" a deposit on the mortgage. *Id.* at 2.

In a letter dated August 8, 1989, Corcoran on behalf of PCC, informed Regent and SMPMC that PCC "[wa]s considering a loan" to SMPMC in the amount of $10,850,000. (Letter from J. Walter Corcoran, President, Philips Credit Corp., to Sugar Mill Point Medical Center, Ltd. c/o Regent Health Group Louisiana, Ltd. (Aug. 8, 1989) ("August 8 Letter") at 1.) The August 8 Letter expressly stated that the loan, "if approved," was subject to various terms and conditions. *Id.* Specifically, the August 8 Letter in relevant part provides that:

(1) The Loan would be evidenced by a note ("the Note"), and the proceeds of the Loan would be used "to construct a 60–bed medical and surgical hospital" in Sugar Point, Houma, Louisiana. *Id.* ¶ 1.

(2) The Note would bear interest, the interest would be calculated and paid according to a set schedule, and that payments on the Note would be applied first to interest and then to principal allocated in accordance with the Rule of 78's (the Sum of the Months Digit Method). *Id.* ¶ 2.

(3) All of SMPMC's obligations to PCC "shall be secured by a first mortgage lien on the Premises and all improvements thereon ("the Mortgage") and shall be guaranteed by Regent...." *Id.* ¶ 3.

(4) The Loan Agreement, the Note, the Mortgage, and all other documents required by PCC to evidence and secure the Loan "shall contain such terms, conditions, and covenants, financial and otherwise, as PCC shall require to protect its interest,

and shall be in form and substance satisfactory to PCC and its counsel." *Id.* ¶ 4.

(5) PCC's commitment to SMPMC would be issued "on the basis of all information provided by [SMPMC]," and any misinformation or withholding of material information "shall, at the option of PCC, void all of PCC's obligations thereunder." *Id.* ¶ 5.

(6) The closing of the Loan transaction "shall be subject to" eighteen separate conditions including "execution and delivery to PCC of all instruments and documents herein contemplated or required to evidence the Loan and grant PCC a valid and perfected lien on the security interest and collateral therefor, all in form and substance satisfactory to PCC and its counsel." *Id.* ¶ 6 & 6(a).

(7) SMPMC would be responsible for paying all fees and expenses incurred in connection with the Loan. *Id.* ¶ 7.

The August 8 Letter concluded with the following request: "If the foregoing terms and conditions provide a basis for funding of this project, please call to arrange a meeting in New York where you and the principals of the Borrower may discuss the issues in this letter." *Id.* at 3.

Defendants explain that after reading the August 8 Letter, Jorgeson telephoned McKinney and Blieberg to point out that the terms set forth in the August 8 Letter "did not accurately set forth the transaction approved by the Credit Committee." (Dfts.Memo at 32.) According to defendants, McKinney and Blieberg agreed that the August 8 Letter did not reflect the terms approved by PCC's Credit Committee, attributed these discrepancies to PCC's legal department's failure to act consistently with the instructions of the Credit Committee, and stated that the August 8 Letter would be withdrawn and replaced with a correct letter. *Id.*; (Jorgeson Aff. ¶¶ 31–32.)

On August 15, 1989, Jorgeson and Shelby went to PCC's office in New York to meet with Blieberg, McKinney, and other representatives of PCC. (Dfts.Memo at 34); (Jorgeson Aff. ¶ 34); (Shelby Aff. ¶ 5.) According to defendants, McKinney and Blieberg informed Jorgeson and Shelby "that the purpose of the meeting was to educate the

PCC legal department as to the nature of the project and the terms of the transaction, as already approved and agreed to, so that the legal department could properly document it." (Jorgeson Aff. ¶ 34); (Dfts.Memo at 34.) Jorgeson states that PCC representatives "propounded numerous questions to [him] and to Dr. Shelby, which they characterized as due diligence," necessary to document the transaction in accordance with the terms that had been approved by the President and Credit Committee of PCC. (Jorgeson Aff. ¶ 34.)

The next day, August 16, 1989, Jorgeson and Shelby again met with Blieberg and McKinney, as well as with Corcoran and Beth Walman ("Walman"), PCC's General Counsel. *Id.* ¶ 35; (Dfts.Memo at 35.) Defendants contend that Walman continuously questioned Jorgeson and Shelby during the meeting. In response to this questioning, Jorgeson asserts that he stated to Corcoran "that [Regent] expected to be dealing with people at PCC who understood the hospital business; that the transaction had already been negotiated and approved, and that after more than three months of negotiations this was not the time to re-examine and re-negotiate it." (Jorgeson Aff. ¶ 36.) Walman purportedly responded "that her job was not to re-negotiate the transaction, but only to document it." *Id.* Jorgeson states that he then "responded that [Walman] should document the deal as it had already been negotiated and approved by PCC and Regent." *Id.* According to Jorgeson, when he spoke again with Walman later that same day, she "was indignant with [Jorgeson] and stated that she had taken [Jorgeson's] comments personally." *Id.* ¶ 37.

Immediately following the August 16, 1989, meeting, Shelby spoke with Corcoran. (Shelby Aff. ¶ 5); (Dfts.Memo at 38.) According to Shelby, Corcoran reassured Shelby "that PCC intended to finance the SMPMC project, and it was clearly understood that it would be on the terms approved by Mr. Corcoran and the Credit Committee in July, 1989." (Shelby Aff. ¶ 5); (Dfts.Memo at 38.) Later, Jorgeson apparently met again with Corcoran and Walman, and Corcoran "assured [Jorgeson] that it was his and PCC's intent to issue a commitment letter to Regent reflecting the terms agreed to between Regent and PCC in July 1989." (Jorgeson Aff. ¶ 40); (Dfts.Memo at 38.) It is Jorgeson's testimony that Corcoran then "instructed Ms. Walman to issue such a commitment letter by Friday of that week." (Jorgeson Aff. ¶ 40); (Dfts.Memo at 38.)

### III. PCC's First Commitment Letter

In a letter dated August 18, 1989, PCC informed defendants it had approved a loan to defendants in the amount of $10,850,000, subject to ten pages of terms and conditions. (Letter from J. Walter Corcoran, President, Philips Credit Corp., to Sugar Mill Point Medical Center, Ltd. c/o Regent Health Group, Inc. (Aug. 18, 1989) ("August Commitment Letter").) Among these terms and conditions, PCC included the following:

The Loan and the Note shall be secured by a first priority lien on and security interest in all now existing or hereafter acquired assets of Borrower, both tangible and intangible, including but not limited to all accounts receivable, licenses, contract rights, equipment, general intangibles, real property, personal property and all other assets relating to the Hospital. *Id.* ¶ A.5.A.

The Loan Agreement, the Note, the Leases and related agreements, all of which shall be governed by New York law.... *Id.* ¶ C.1.

The execution, acknowledgement (when necessary) and delivery of all documents in connection with this transaction, including but not limited to the Loan Agreement, the Note, the Leases, all security agreements, ... and other related agreements and instruments executed in connection with this transaction shall be in form and substance satisfactory to PCC and its counsel. *Id.* ¶ C.2.

This Commitment shall automatically expire and terminate if (i) PCC has not received the enclosed copy of this letter duly executed and accepted by Borrower within ten (10) days from the date hereof, and (ii) if the transactions referred herein have not closed within ninety (90) days from the date hereof. *Id.* ¶ C.4.

No provision of this Commitment may be waived, modified or terminated except by written instrument duly executed by a duly authorized officer of PCC. *Id.* ¶ C.8.

On the last page of the August Commitment Letter, PCC provided signature lines for both SMPMC and Regent as follows:

ACCEPTED AND AGREED to this

_____ day of _____, 1989

SUGAR MILL POINT MEDICAL CENTER, LTD.

By: REGENT HEALTH GROUP, INC.
 its sole general partner

 By: _____
 Title

REGENT HEALTH GROUP, INC.,
 As Guarantor

By: ........
 Title

*Id.* at 10. It is undisputed that neither Regent nor SMPMC executed the August Commitment Letter. (Answer ¶ 9); (Pltf.Memo at 8.)

## IV. Events Subsequent to the Issuance of PCC's First Commitment Letter

The parties present different versions of some events that immediately followed PCC's issuance of the August Commitment Letter.

According to defendants,

in several respects the [August Commitment Letter] did not reflect the terms of the transaction as they had been agreed to between Regent and PCC in July. Within 15 minutes after receiving [the August Commitment Letter] on August 18, Mr. Jorgeson pointed this out to Mr. Corcoran in person. Mr. Corcoran responded that the commitment letter should reflect the terms agreed to between the parties in July, and that if it did not, it must have just been a drafting error, and that a corrected commitment letter would be issued reflecting the terms as agreed to in July. The August 18 letter was thus immediately withdrawn by the President of the Company. At the time it was withdrawn, Mr. Corcoran was leaving for a two week vacation. Since he himself had to sign the commitment letter, it was at that point physically impossible to issue a final commitment letter before another 14 days would pass. Mr. Blieberg, in his deposition, confirmed that the commitment letter was shown as "back" on August 18, 1989, the same day it was issued.

(Dfts.Memo at 40.) Plaintiff neither admits that these incidents took place, nor responds to defendants' recitation of them. *See generally* (Pltf.Memo); (Reply Memo.)

Both plaintiff and defendants agree, however, on the next sequence of events. Beginning in Fall 1989, defendants sought financing for SMPMC from sources other than PCC. According to Jorgeson, defendants discussed the working capital and real estate financing of SMPMC with Sovran Bank in Nashville, Tennessee ("Sovran"). (Deposition of Brent W. Jorgeson, *Philips Credit Corp. v. Regent Health Group, Inc.,* 90 Civ. 2838 ("Jorgeson Dep.") at 474–75 (Sept. 15, 1992).) Jorgeson testified that defendants met with Sovran as an alternative source of financing "if for some reason, Philips did not perform...." *Id.* at 476. Samuel W. Chopin, the Sovran representative with whom Jorgeson dealt, corroborates Jorgeson's efforts to obtain financing through Sovran. (Deposition of Samuel L. Chopin, *Philips Credit Corp. v. Regent Health Group, Inc.,* 90 Civ. 2838 ("Chopin Dep.") at 60–65 (Aug. 12, 1992).)

On September 2, 1989, Jorgeson wrote to Corcoran regarding the August Commitment Letter. (Letter from Brent W. Jorgeson, President, Regent Health Group Inc., to J. Walter Corcoran, President, Philips Credit Corp. (Sept. 2, 1989) ("September 2 Letter")); (Pltf.Memo at 8–9); (Dfts.Memo at 41–42.) In the September 2 Letter, Jorgeson states that Regent is "pleased to have received [PCC's] letter of August 18, 1989 regarding Philips Credit's loan commitment for the Sugar Mill Point Medical Center in Houma Louisiana," and that he "appreciate[s] the time that [PCC's] staff h[as] taken to familiarize [itself] with the project and with our company, and for the time that was spent in drafting the commitment letter." (September 2 Letter at 1.) Jorgeson continues that "[a]s can be expected with any document of similar length, there are several

modifications and clarifications that [Regent] would like to see made in the commitment letter." *Id.* Jorgeson then provides approximately five pages of these "modifications and clarifications." Specifically, Jorgeson and Regent objected to or requested additional information regarding at least seventeen separate items in the August Commitment Letter, including (1) the interest rates, (2) the amortization period, (3) the "Rule of 78's" methodology, (4) the prepayment penalty calculation, (5) the contingent interest provision, (6) the provision regarding the pledge of the partnership interests in SMPMC, (7) the requirement that the SMPMC partners evidence their commitment to invest additional equity to cover cost overruns and cash flow shortfalls, (8) the commitment fee, (9) estimated costs and expenses, and (10) Regent's deadline for accepting the commitment. *Id.* at 1–5; *see* (Pltf.Memo at 8); (Dfts.Memo at 41.)

Jorgeson concluded the September 2 Letter by suggesting that he and Corcoran "discuss the best way to reach clarification and resolution on these issues," and stating that he "w[ould] be glad to come to New York if that w[ould] expedite the process." (September 2 Letter at 5.) Jorgeson further opined that he "th[ought] that we are very close to having a financing agreement that is acceptable to both parties and that will result in a successful financing for what will be a successful project." *Id.*

On September 19, 1989, PCC wrote to Jorgeson requesting additional documentation and information regarding SMPMC, noting that "this information will assist in [PCC's] evaluation of the overall feasibility of the proposed project." (Letter from Morrey S. Halfon, Philips Credit Corp., to Brent W. Jorgeson, President, Regent Health Group, Inc. ("Morrey Letter") at 1 (Sept. 19, 1989).) The Morrey Letter covered almost four pages, and included requests for such information as (1) the service area demographics for the geographic area SMPMC intended to serve, *id.* at 1, (2) the percentage of potential SMPC patients covered by Medicare, *id.*, (3) whether private insurance coverage, HMOs, and PPOs in the Houma area were expanding, *id.*, (4) profiles on the physicians in-

volved in the SMPMC project, *id.* at 1–2, (5) reports on the medical providers with whom SMPMC would compete, *id.* at 2, (6) "a contingency plan for SMPMC should [the existing local hospital] inact [sic] any sanctions against the investing physicians," *id.*, (7) additional facilities plans, *id.*, (8) information on the average salaries for nurses, technicians, and other professional staff that SMPMC would hire, *id.* at. 3, (9) detailed financial analysis regarding the expected sources of SMPMC's revenues, SMPMC's anticipated growth rate, and its costs and expenses, *id.*, and (10) "a detailed map of the location of SMPMC and the distance to the other hospital [in the area]," as well "a copy of the master plan for the Sugar Mill Point area. . . ." *Id.* at 4.

On September 20, 1989, Shelby, Bell, and Jorgeson again travelled to New York to meet with PCC representatives to discuss the SMPMC project. (Letter from Brent W. Jorgeson, President, Regent Health Group, Inc., to J. Walter Corcoran, President, Philips Credit Corp. (Sept. 22, 1989) ("September 22 Letter")); (Pltf.Memo at 9.) In a letter addressed to Corcoran following this meeting, Jorgeson stated that he believe[d] that within two weeks [Regent and SMPMC] will have almost all of the information [PCC] requested [in the September 2 Letter] and we are confident that it will support the basis for our business plan. *Id.* at 1. Jorgeson also revealed, however, that "[w]hile we made progress in several areas this week, we also faced new, significant problems raised by Beth Walman." *Id.* These problems included (1) PCC's prohibition on SMPMC "mak[ing] any cash distributions to partners until half of the principal balance on the loan ha[d] been paid off," *id.*, and (2) Walman's desire "to wait to try and reach agreement on other key elements until Philips has had time to 'process' the information [defendants] suppl[ied] in response to the [September 2 Letter]." *Id.* Jorgeson also requested Corcoran's "immediate, direct, and continuous personal involvement" in the SMPMC negotiations because Corcoran "clearly ha[d] the final decision making authority for [his] company. . . ." *Id.* at 2. Jorgeson offered to return to New York for further negotiations, and alternatively, suggested that the parties

meet in either New Orleans or Nashville. *Id.* at 2–3.

In a letter dated September 28, 1989, Corcoran responded to Jorgeson's concerns. (Letter from J. Walter Corcoran, President, Philips Credit Corp., to Brent W. Jorgeson, President, Regent Health Group, Inc. (Sept. 28, 1989) ("September 28 Letter").) Regarding PCC's prohibition against distributions to partners prior to the prepayment of a significant portion of defendants' indebtedness to PCC, Corcoran informed Jorgeson "that this issue had been previously discussed with and agreed to by [Corcoran]." *Id.* Corcoran explained that "[i]t is the position of PCC as a general rule that the equity investment remains until all of PCC's indebtedness has been repaid otherwise it can hardly be considered equity," and that the contractual "language restricting payments to investors is part of the 'boiler plate' of all our major financing agreements." *Id.*

As for PCC's continued due diligence, Corcoran stated that the due diligence, "if successfully concluded, will enable PCC to have more confidence in the economic viability of this project than we are currently able to justify based on the information currently in our possession." *Id.* at 2. Corcoran continued:

we recognize, and hope you do too that due diligence is a continuing process as a general rule until a transaction is closed, and in this particular transaction would be a continuing process even after a preliminary closing since, in this particular transaction any loan agreement which we might enter into would contain numerous conditions of funding. However, before we go further, I feel it would be useful for you to have resolved the issue [regarding distributions to partners] and for us to obtain and analyze the information that we've previously requested.

*Id.*

Finally, Corcoran addressed Jorgeson's characterization of Corcoran's role in PCC's decision-making process. Corcoran stated that he was certain that Jorgeson

must understand from [his] current work experience and your previous work experience that no successful business enterprise

can operate successfully through a single human being and of course, PCC is no different. What this means is that of course as President of this Corporation I have the final decision making authority and have a very positive attitude toward this project, I delegate much of the responsibility for obtaining information and analyzing that information to trusted members of my staff who, are fully capable of functioning in their assigned roles.

*Id.* at 3. Corcoran also addressed Jorgeson's earlier concern's regarding the negative attitude toward the SMPMC that Jorgeson claimed to have perceived in some PCC representatives. Corcoran assured Jorgeson that Corcoran had "discussed this transaction at great length with both Ms. Walman and Mr. Halfon and [was] satisfied that neither person had a 'negative attitude' towards this transaction, but rather, that both individuals have the normal skepticism of lending officers attempting to make a prudent lending decision." *Id.* Finally, Corcoran stressed the need for Jorgeson to cooperate with Walman and other PCC representatives in order to reach "a prudent lending decision." *Id.*

According, to defendants, "[b]eginning in September, 1989, PCC retained Deloitte, Haskins & Sells ("DHS") of Houston, Texas to complete the due diligence process contemplated by the August 18 draft letter. Much of Regent's time during the months of September, 1989 through January, 1990 was spent complying with due diligence requests propounded by PCC and DHS." (Dfts.Memo at 43–44.) Defendants state that "[t]he demands made by PCC during this time period specifically tracked the closing conditions and other preparations for closing reflected in the August 18 draft letter." *Id.* at 45. Defendants allege that their efforts to comply with PCC's demands forced defendants to "expend[ ] substantial sums of money and several months of man-hours." *Id.*

In a letter dated November 7, 1989, Jorgeson informed Corcoran that Regent "ha[d] made progress in several key areas of the project." (Letter from Brent W. Jorgeson, President, Regent Health Group, Inc., to J. Walter Corcoran, President Philips Credit

Corporation, at 1 (Nov. 7, 1989) ("November 7 Letter").) Jorgeson further informed Corcoran that Regent "ha[d] come up with a suggested modification on the handling of distributions that [Regent] [thought] w[ould] meet [PCC's] need for protecting the security of the loan, while at the same time not penalizing the project's partners for making the project successful." *Id.* Jorgeson spent two pages updating PCC on the SMPMC project's specifications, *id.* 1–3, then three pages detailing defendants' suggested modification of PCC's terms regarding distributions of the equity contributions of SMPMC's limited partners. *Id.* at 3–5. Jorgeson also attached to this letter a "Preliminary Departmental Equipment List" detailing the costs of items necessary to furnish and outfit SMPMC. *Id.* at 6–9.

Two days later, Corcoran responded to Jorgeson's correspondence, stating that Jorgeson's proposal regarding equity distributions was "a step in the right direction, but it [was] still generally unacceptable." (Letter from J. Walter Corcoran, President, Philips Credit Corporation, to Brent W. Jorgeson, President, Regent Health Group, Inc., at 1 (Nov. 9, 1989) ("November 9 Letter").) Corcoran further advised Jorgeson that PCC had received "the voluminous material which [defendants] prepared in response to [PCC's] August request and ... [was] sending it to [PCC's outside] consultants for their immediate review." *Id.* Corcoran concluded this letter by stating that no further meeting between the parties was necessary "until [PCC] h[ad] feed back from [its] consultants and [could] hopefully formulate the remaining questions needed to allow [PCC] to make a final decision." *Id.* at 2.

On December 4, 1989, Jorgeson wrote to Corcoran to complain that Morrey of PCC was not responding to Jorgeson's phone calls or otherwise being cooperative in dealing with the SMPMC project. (Letter from Brent W. Jorgeson, President, Regent Health Group, Inc., to J. Walter Corcoran, President, Philips Credit Corp. (Dec. 4, 1989).) On December 12, 1989, Bell, Regent's Vice–President, sent a letter to a potential investor in the SMPMC project stating that PCC's funding commitment for the project "is subject to the lender conducting its' [sic] due diligence." (Letter from Steven J. Bell, Vice–President, Regent Health Group, Inc., to Dr. Thomas H. Ellender (Dec. 12, 1989) ("Bell Letter").)

In January 1990, Jorgeson sent two letters to DHS, PCC's outside consultants, regarding the SMPMC project. These letters contained information regarding topics such as the composition of the SMPMC limited partners' medical practices, estimated average revenue and occupancy for SMPMC, and detailed cost projections for the facility's first three years. These letters spanned seventeen and forty pages respectively. *See generally* (Letter from Brent W. Jorgeson, President, Regent Health Group, Inc., to W. Roger Stroud, Senior Manager, The Douglass Group of Deloitte & Touche (Jan. 9, 1990)); (Letter from Brent W. Jorgeson, President, Regent Health Group, Inc., to W. Roger Stroud, Senior Manager, The Douglass Group of Deloitte & Touche (Jan. 3, 1990).)

On January 16, 1990, Jorgeson and Bell met with Blieberg in New Orleans. According to Jorgeson, Blieberg stated during this meeting that Corcoran and PCC still intended to do the SMPMC transaction on the terms agreed to in July 1989, and that if either Corcoran or PCC decided not to do the transaction on those terms, Blieberg would so inform defendants. (Dfts.Memo at 56); (Jorgeson Aff. ¶ 61.) On January 17, 1990, Blieberg and Halfon of PCC, and representatives from DHS and HFC, met with Jorgeson, Bell and other Regent representatives in Houma. (Dfts.Memo at 56–57); (Jorgeson Aff. ¶ 62.) According to defendants, at the conclusion of this meeting, "Halfon stated that what he had seen and heard that day supported the assumptions in the SMPMC business plan," and Blieberg reiterated "that the PCC Credit Committee had already set the terms of the transaction (i.e., in July, 1989) and that the Credit Committee (including Mr. Corcoran) had decision-making authority in the matter and had already made its decision in July, 1989." (Dfts.Memo at 57.) Following this meeting, defendants assert that they learned that cer-

tain PCC representatives were hostile to Regent and Jorgeson. *Id.* at 57–58.

According to Jorgeson, on February 9, 1990, Blieberg told Regent that a corrected commitment letter would be issued the following week. *Id.* at 59; (Jorgeson Aff. ¶ 64.) Defendants state that they never received such letter. Jorgeson further asserts that on February 16, 1990, Blieberg again told Regent that a corrected commitment letter would be issued the following week. (Dfts.Memo at 59); (Jorgeson Aff. ¶¶ 65–66.) Defendants proclaim that they were "given no reason to believe that the letter would be anything other then the terms set forth in July, 1989." (Dfts.Memo at 59.)

Defendants allege that on February 27, 1990, Blieberg spoke to Jorgeson, and "Blieberg expressed his frustration that the PCC legal department had still not produced the letter." *Id.* That same day, Jorgeson wrote Corcoran to request Corcoran's "assistance in breaking the log-jam in getting a final commitment letter produced at PCC." (Letter from Brent W. Jorgeson, President, Regent Health Group, Inc., to J. Walter Corcoran, President, Philips Credit Corp., at 1 (Feb. 27, 1990) ("February 27 Letter").) Jorgeson concluded his letter by asking Corcoran to "[p]lease let [Jorgeson] know when [defendants] c[ould] expect to receive the commitment letter." *Id.* at 2.

Defendants assert that the following events occurred subsequent to Jorgeson's February 1990, correspondence. On March 5, 1990, Jorgeson called Halfon. (Dfts.Memo at 60.) During this conversation, Halfon allegedly told Jorgeson "that the SMPMC project had been the subject of extensive discussion during PCC's quarterly sales meeting," that the SMPMC project "was the type of project that PCC wanted to do more of, and that PCC was therefore instructing its sales personnel on how to evaluate and work up more such projects in the future." (Jorgeson Aff. ¶ 68.) Halfon further "stated that he was working on the commitment letter," but "[t]here was no implication . . . that the commitment letter would be inconsistent with the terms agreed to in July, 1989." *Id.*

According to Jorgeson, on March 9, 1990, Halfon again called Jorgeson to discuss the commitment letter. *Id.* ¶ 69. Jorgeson claims that Halfon "stated that he had removed some of the closing conditions that had been contained in the August 18, 1989 closing letter," and that there were "a couple of minor changes" that Halfon wanted to review with Jorgeson. *Id.* Jorgeson states that the only change that Halfon mentioned at this time "was that PCC wanted Regent to pay $50,000 toward the commitment fee at the time of signing the letter (with the balance due at closing)." *Id.* Jorgeson further avers that Halfon also made two "clarifications of the August 18 letter": (1) that two banks in Louisiana acceptable to PCC would be established as the banks upon which the physician limited partners could rely to back the portion of their commitments due at closing; and (2) that the equipment lessor could be any equipment lessor satisfactory to both PCC and Regent. *Id.*

Jorgeson next asserts that he spoke frequently with PCC during the week of March 12–16, 1990, and that although PCC told him that the commitment letter would be sent by the end of the week, "[f]urther dells ensued." *Id.* ¶ 70. On March 20, 1990, Jorgeson states that he received a phone call from Walman and Halfon who "indicated for the first time that PCC was contemplating changes in the major terms of the transaction." *Id.* ¶ 71. According to Jorgeson, following this call, PCC continued to tell Jorgeson that "PCC would get to [the commitment letter] as soon as it could, and PCC proffered numerous excuses for the delay." *Id.*

According to Shelby, in early April 1990, Shelby called Blieberg "to ask the reasons for the repeated delays by PCC in getting the commitment letter," and Blieberg "relayed his extreme frustration at the unwillingness of the PCC legal department to issue the letter as had been repeatedly promised by PCC to Regent." (Shelby Aff. ¶ 10); *see* (Deposition of Dr. Barry Shelby, *Philips Credit Corp. v. Regent Health Group, Inc.,* 90 Civ. 2838 ("Shelby Dep.") at 84–86 (March. 26, 1993).) Both Corcoran and Blieberg acknowledge that Blieberg was frustrated with the pace of the SMPMC transaction. (Corcoran Dep. at 109–10.)

Defendants further allege that during April 1990, PCC confirmed in writing that it had committed to do the SMPMC project. (Dfts.Memo at 65.) Defendants state that "[a]s recently as April 2, 1990, PCC stated to HFC's auditors in writing, with reference to Sugar Mill Point Medical Center, Ltd./Guarantor Regent Health Group, Inc." that PCC "had committed funding for the above lease financing transactions as of December 31, 1989 and that the lease financing transactions have taken place during 1990 or will be funded by [PCC] in 1990." *Id.* Defendants then claim that "[o]n May 8, 1990—eleven days after this litigation commenced—the Vice President and Treasurer of PCC, wrote to HFC's auditors and retracted Mr. Blieberg's April 2, 1990 letter," stating that "Blieberg erroneously confirmed certain funding commitments regarding [SMPMC] when in fact no such commitments had ever been made." *Id.* at 65–66.

On April 2, 1990, Jorgeson wrote Corcoran "expressing Regent's frustration over the unexplained delays in issuing the commitment letter." (Jorgeson Aff. ¶ 72.) In this letter, Jorgeson stated the following:

As things stand now, I believe that we are worse off now than we were nearly two moths ago when we at least thought we would be getting the commitment letter within a week. Now I don't know when or if we will ever get the letter, I don't know whom our contact person should be, and I get the feeling that PCC wishes that we would just go away and stop "bothering" you with business.

While we have been *exceedingly* patient during this process of repeatedly raised expectations followed by inaction and broken commitments, our patience has now been consumed. In our opinion, PCC has not dealt with Regent Health Group and our SMPMC partners in a fair and responsible manner. I must tell you that the apparent disorganization, confusion and misrepresentation emanating from the legal/credit side of PCC involving our project it totally unacceptable, and is causing us significant expense, risk exposure, and opportunity cost.

Walter, I honestly believe your intentions to be good, as well as those of many others at PCC; but somehow, those intentions are not translating into action. I also honestly believe that an impartial observer would find PCC's good faith and veracity as a lender and as a commercial enterprise to be lacking in this transaction.

We have believed throughout this process that we could meet the criteria that you set forth for us last summer and fall. We, along with our partners and investors, have diligently worked and spent a large amount of money to meet the criteria. We believe that the criteria have been met. In the process we have eschewed almost all other potential lending sources, believing that we (PCC and Regent) were each working in good faith to accomplish the transaction as set forth last summer and fall.

We are now faced with the growing belief among Regent and SMPMC officers, partners, investors and supporters that PCC is now trying to renege on its commitment and thereby kill the project. If that is the case, then we should be so informed in writing. If that is not the case, then we need to set up a meeting immediately to discuss how to move this project forward.

(Letter from Brent W. Jorgeson, President, Regent Health Group, Inc., to J. Walter Corcoran, President, Regent Credit Corp., at 2–3 (April 2, 1990) ("April 2 Letter") (emphasis in original).)

### V. PCC's Second Commitment Letter

In a letter dated April 12, 1990, PCC informed defendants that PCC was "willing to (i) make a loan" to SMPMC in the amount of $10,850,000, "and (ii) enter into ... lease transactions ... on and subject to the following terms and conditions, including, without limitation, PCC's completion of its due diligence in connection with the transactions contemplated hereby." (Letter from Morrey S. Halfon, Vice President, Philips Credit Corp., to Sugar Mill Point Medical Center, Ltd. c/o Regent Health Group, Inc. (April 12, 1990) ("April Commitment Letter").) As in the August Commitment Letter, the April

Commitment Letter included the following terms and conditions:

> The Loan and the Note shall be secured by a first priority lien on and security interest in all now existing or hereafter acquired assets of Borrower, both tangible and intangible, including but not limited to· all accounts receivable, licenses, · contract rights, equipment, general intangibles, real property, personal property and all other assets relating to the Hospital. *Id.* ¶ A.5.A.

> The Loan· Agreement, the Note, the Leases and related agreements, all of which shall be governed by New York law.... *Id.* ¶ C.1.

> The execution, acknowledgement (when necessary) and delivery of all documents in connection with this transaction, including, but not limited to the Loan Agreement, the Note, the Leases, all security agreements, ... and other related agreements and instruments executed in connection with this transaction shall be in form and substance satisfactory to PCC and its counsel. *Id.* ¶ C.2.

> This Commitment shall automatically expire and terminate if (i) PCC has not received the enclosed copy of this letter duly executed and accepted by Borrower within ten (10) days from the date hereof,.and (ii) if the transactions referred herein have not closed within ninety ·(90) days from the date hereof. *Id.* ¶ C.13.

> No provision of this Commitment may be waived, modified or terminated except by written instrument duly executed by a duly authorized officer of PCC. *Id.* ¶ C.9.

The April Commitment Letter also contained the following provision:

> This letter supersedes any and all prior oral or written agreements, communications, representations and discussions between Borrower and PCC. *Id.* ¶ C.8.

On the. last page of the August Commitment Letter, PCC provided signature lines for both SMPMC and Regent as follows:

> ACCEPTED AND AGREED to this
> ____ day of ____, 1990
> SUGAR MILL POINT MEDICAL CENTER, LTD.
> By: REGENT HEALTH GROUP, INC.
> its sole general partner
> By: _____
> Title
> · REGENT HEALTH GROUP, INC.,
> As Guarantor
> By: _____
> , Title ·

*Id.* at 13. Once again, it is undisputed that neither Regent nor SMPMC executed the April Commitment Letter. (Answer ¶ 13); (Pltf.Memo at 14.)

In a letter dated April 20, 1990, Jorgeson informed Corcoran that defendants "were very dismayed and disappointed when [they] received [the April Commitment Letter]." (Letter from Brent W. Jorgeson, President, Regent Health Group, Inc., to J. Walter Corcoran, President, Philips Credit Corp., at 1 (April 20, 1990) ("April 20 Letter").) Jorgeson asserted that the April Commitment Letter "contained numerous material changes from the business points that have been the basis for this transaction since last summer and fall," several of which "cut right to the heart of the deal" and were "known by [PCC] to have been unacceptable in any such form all along." *Id.* Jorgeson listed several of these changes, such as (1) the guarantees required of the limited partners, (2) PCC's fee, (3) PCC's interest charges, and (4) PCC's intention to calculate the floating rate of interest according to the Rule of 78's, *id.,* and attached an "Amendment" specifically outlining all of its concerns regarding the April Commitment Letter. *Id.,* Amendment. A.

Jorgeson next informed Corcoran that defendants "fe[lt] that either (1) Philips has made errors in its April 12th letter which it can upon further review quickly amend, or (2) Philips has materially misrepresented its intentions over the last eleven months." *Id.* at 1. In the event that PCC merely had made errors in the April Commitment Letter, defendants were "quite willing to proceed with [PCC] on the project with a loan as set forth in· the April 12th Letter after incorporating the Amendment." *Id.* at 1–2. Jorgeson then informed Corcoran that if defendants did not "within ten days from the

date of this letter receive a commitment from [PCC] that reflects each of the changes required in the Amendment," then defendants would conclude that PCC had made material misrepresentations to defendants. *Id.* at 2. "In preparation of such an eventuality," Jorgeson informed Corcoran that defendants had "asked [their] attorneys to communicate directly with [PCC] regarding [defendants'] position." *Id.* at 2.

That same day, Regent's counsel wrote to PCC and threatened to sue PCC unless PCC modified the April Commitment Letter to include the terms that "Philips previously committed to, both orally and in writing, last summer and fall." (Letter from Rick Triplett, Esq., to J. Walter Corcoran, President, Philips Credit Corp., at 1–2 (April 20, 1990).) In response to this letter, PCC filed suit on April 27, 1990, seeking a declaratory judgment "that there exists no valid, enforceable contractual obligation" between plaintiff and defendants. (Complaint, ¶¶ 4, 17.) Defendants filed their answer and counterclaim on June 29, 1990. (Answer at 35.)

## DISCUSSION

Presently before this Court is plaintiff's motion for summary judgment. Plaintiff seeks "an order pursuant to Rule 56 of the Federal Rules of Civil Procedure granting the relief set forth in the complaint and dismissing defendants' counterclaims on the grounds that there are no genuine issues of material fact and plaintiff is entitled to judgment as a matter of law." (Notice of Motion.) Defendants oppose plaintiff's motion, and raise the question what substantive law applies to this Court's resolution of the instant dispute. Because the outcome of this Court's choice-of-law determination affects this Court's analysis of the parties' substantive disputes, this Court will address the choice-of-law issue first before moving on to the parties' competing claims regarding plaintiff's summary judgment motion.

## I. Choice of Law

To answer the question what law governs this Court's resolution of the case at bar, this Court must conduct a detailed choice-of-law analysis. Before resolving this question, this Court will review the parties' respective claims and the governing law on this issue.

### A. The parties' respective choice-of-law claims.

In the papers initially submitted to this Court, plaintiff assumes that New York law applies to the instant case. *See generally* (Pltf.Memo.) Defendants, however, contest this issue from the outset. (Dfts.Memo at 72–73.) They state that under federal choice-of-law rules, this Court's determination of the law applicable to the parties' dispute is governed by New York law. *Id.* Defendants explain that "New York courts determine the applicable substantive law by analyzing which state has the most significant interest in governing the particular conduct at issue," and that "[t]he controlling facts and the policies implicated in this action dictate that the law of Texas should govern the resolution of this dispute." *Id.*

Defendants provide this Court a laundry list of factors in support of this claim. They state that: (1) defendant Regent is domiciled in Texas; (2) Regent was founded by a Texan, and "[i]ts offices, staff, bank accounts, files and telephone listings are located in Texas"; (3) the misrepresentations upon which defendants' first through third counterclaims are based "were received in Texas either in person or by mail, fax or telephone"; (4) "the promises upon which the fourth count of the counterclaim (promissory estoppel) is based were received in Texas in writing or by telephone, or were made in New York to Regent's principles who were Texas domiciliaries"; (5) "[t]he business relationship upon which the sixth count of the counterclaim (tortious interference) is based were formed in the State of Texas"; (6) "the contract upon which the fifth count of the counterclaim is based was negotiated between persons in the States of Texas and New York and contemplated involvement of another Texas lander"; and (7) "[w]hen the transaction was approved by the PCC Credit Committee, its terms were communicated by telephone to Regent in the State of Texas and were accepted by Regent in Texas." *Id.* at 72–73.

Defendants further expound that: (8) the injury arising out of the parties' dealings—the financial loss to Regent—was sustained in Texas; (9) Regent's conduct in reliance upon PCC's misrepresentations occurred in Texas; (10) "PCC was to loan funds to Regent for disbursement in Texas"; (11) "[b]oth parties partially performed the contract in Texas"; (12) "Regent's repayments of the Loan were to be made from its offices in Texas"; (13) "[p]ivital correspondence in this case was addressed to Regent in Texas"; and (14) when PCC repudiated the contract, "its repudiation was communicated by telephone and by fax to Regent at its offices in Texas." *Id.* at 73–74.

Based on these factors, defendants assert that "[t]ort laws are aimed not only at regulating conduct, but at compensating persons who suffer injury," and therefore, "the state of the injured party's domicile usually has the most significant relationship to the case." *Id.* at 74. Defendants further argue that "[a]pplying New York conflict of law principles to Regent's counterclaim[s], Texas clearly has the paramount interest in applying its law to the issues in dispute, since the consequences of the improper conduct for which Regent seeks legal redress were experience by Regent in Texas." *Id.* at 75. According to defendants, "Texas undeniably has the predominant interest in protecting its own citizens from injury caused by tortious and other unlawful conduct, the effects of which occurred in Texas," and thus Texas law should apply. *Id.* at 75–76. In the alternative, defendants argue that the choice-of-law issue at least presents questions of material fact that render inappropriate an entry of summary judgment on this issue. *Id.* at 76.

In response to defendants' claims, plaintiff offers two competing theories on the choice-of-law issue. First, plaintiff states that under New York law, contractual choice-of-law principles "require an initial inquiry into the intent of the parties as the starting point in determining which state's law applies to a contract action." (Reply Memo at 3.) Citing a provision of the New York General Obligations Law, plaintiff contends that "in matters concerning the validity, construction or effect of a contract in New York involving $250,000 or more, such as the contract in dispute here, choice of law provisions designating that New York law shall apply are given binding effect regardless of whether the contract bears a reasonable relation to New York." *Id.*

Plaintiff states that both draft commitment letters issued by plaintiff to defendants "establish respectively[ ] that New York law applies to Defendant's contract claim," because "[e]ach of the commitment letters states unequivocally that [t]he loan agreement, note and *all related agreements ... shall be governed by New York law.*" *Id.* at 4 (emphasis in original). According to plaintiff, under relevant case law, the parties' failure to execute these letters does not require a different result. *Id.* Plaintiff relies for this assertion on *Frutico, S.A. de C.V. v. Bankers Trust Co.*, 833 F.Supp. 288, 296 (S.D.N.Y.1993). *Id.*

Plaintiff explains that in *Frutico*, "the lender maintained that there was never an agreement reached between the parties in that action." *Id.* "Nevertheless," the court in *Frutico* "relied on the choice of law provision contained in unexecuted drafts of an alleged loan agreement to determine that the parties intended that New York law would govern the purported agreement." *Id.* Consequently, "the court applied New York law and concluded that, as a matter of law, there was no valid contract between the parties." *Id.* at 4–5. Plaintiff thus concludes that "the fact that the choice of law provision is in unexecuted commitment letters does not preclude this Court from finding that New York law applies to the instant dispute." *Id.* at 5. Plaintiff further points out that, although defendants provided numerous and lengthy objections to both commitment letters "they never objected to the New York choice of law provision[,] [and] [t]hus it logically follows that Defendants intended that New York would apply to the Alleged Agreement." *Id.*

Alternatively, plaintiff submits that even if the choice-of-law provisions in the August and April Commitment Letters are insufficient to establish that New York law governs the instant dispute, New York law governs this Court's resolution of the motion at bar under the "paramount interest test." *Id.*

Plaintiff explains that under the paramount interest test, New York courts faced with contractual choice-of law questions "consider[ ] the state having the most 'substantial relationship' or 'significant contacts' with the parties and the contract to determine which state's law applies." *Id.* at 5–6. Plaintiffs assert that "[m]ost, if not all, of the significant contacts regarding the Alleged Agreement occurred in New York," and that therefore, New York law applies. *Id.* at 6. Plaintiff enumerates each of the contacts that allegedly support this conclusion. First, plaintiffs state that "all of the face-to-face negotiations regarding the Alleged Agreement were conducted in either New York or Louisiana with one preliminary meeting in Florida." *Id.* Plaintiff further declares, and alleges that defendants do not dispute, that no meeting between the parties ever took place in Texas. *Id.* Second, "the gravamen of Defendants' contract claim is based on Philips' 'approval' and 'repudiation' of the Alleged Agreement—action which allegedly occurred in New York." *Id.* Third, "under the terms of the Alleged Agreement, Philips was expected to fund the loan from its principal place of business in New York." *Id.*

Fourth, plaintiff reports that "Defendants were expected to repay the loan to Philips at its office in New York." *Id.* Plaintiff explains that this fact is significant to this Court's choice-of-law determination because under the Restatement (Second) of Conflict of Laws,

> [t]he validity of a contract for the repayment of money lent and the rights created thereby are determined in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that repayment be made....

*Id.* at 6 (quoting Restatement (Second) of Conflict of Laws § 195 (1971)). Finally, plaintiff asserts that "New York has a strong interest in protecting its position as a national business capital," and that New York therefore has a "paramount interest" in this lawsuit that necessitates the application of New York law. *Id.* at 7.

### B. New York state choice-of-law principles.

■ It is black-letter law that a federal district court sitting in diversity must apply the substantive law of the state in which it sits. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). Because choice-of-law rules are substantive in nature, this Court must apply the choice-of-law rules of the state in which it sits—New York. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Cargill, Inc. v. Charles Kowsky Resources, Inc.*, 949 F.2d 51, 55 (2d Cir.1991).

■ New York's choice-of-law rules "require[ ] application of the law of the state having the most significant contacts with the matter in dispute." *American Centennial Ins. Co. v. Sinkler*, 903 F.Supp. 408, 411 (E.D.N.Y.1995); *see Auten v. Auten*, 308 N.Y. 155, 160, 124 N.E.2d 99 (1954); Restatement (Second) Conflict of Laws, § 188 (1971). This approach "is known as the 'center of gravity' or 'grouping of contacts' approach." *Sinkler*, 903 F.Supp. at 411; *see Auten*, 308 N.Y. at 160, 124 N.E.2d 99. Under New York law, "[w]hether [a] case is viewed primarily as a contract dispute or as an action in tort may affect the location of the center of gravity." *Sinkler*, 903 F.Supp. at 411. This position is supported by the Restatement (Second) Conflict of Laws (1971) ("the Restatement").

Under the Restatement, "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied...." Restatement (Second) Conflict of Laws, § 187. In the absence of a choice of law by the parties, the Restatement sets forth principles which guide a court's determination of this question. Section 201 of the Restatement declares that absent a contractual choice-of-law provision,

> [t]he effect of misrepresentation, duress, undue influence and mistake upon a contract is determined by the law selected by application of the rules §§ 187–188.

Restatement (Second) Conflict of Laws, § 201 & cmt. a. Section 188 in relevant part provides:

(2) In absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account .... to determine the law applicable to an issue include;

(a) the place of contracting,

(b) the place of negotiating,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this states will usually be applied, except as otherwise provided in §§ 188–89 and 203.

*Id.,* § 188(2)–(3). New York state law mirrors these principles.

■ New York law recognizes the validity of contractual choice-of-law provisions. Case law is "unambiguous" that "absent fraud or violation of public policy, contractual selection of governing law is generally determinative so long as the State selected has sufficient contacts with the transaction." *International Minerals & Resources v. Pappas,* 96 F.3d 586, 593 (2d Cir.1996) (citations omitted). This principle applies equally to a contractual choice-of-law provision in an unexecuted draft of an alleged contract. *See Frutico, S.A. de C.V. v. Bankers Trust Co.,* 833 F.Supp. 288, 296 (S.D.N.Y.1993).

■ Moreover, in matters concerning the validity, construction, or effect of a contract in New York involving $250,000 or more, Section 5–1401 of the New York General Obligations Law ("Section 5–1401") mandates that a choice-of-law provision in a contract designating that New York law governs the parties' rights and duties shall be given binding effect regardless of whether the contract bears a reasonable relation to New York. N.Y.Gen.Oblig.Law § 5–1401 (McKinney 1989). In enacting Section 5–1401, the New York State "Legislature made explicit that 'public policy favors New York courts retaining lawsuits where New York is the designated forum.' " *Babcock & Wilcox Co. v. Control Components,* 161 Misc.2d 636, 641, 614 N.Y.S.2d 678 (N.Y.Sup.Ct.1993) (citation omitted).

■ In the event that a contract contains no choice-of-law provision, New York courts apply an "interest analysis," pursuant to which "the 'law of the jurisdiction having the greatest interest in the litigation' controls." *M.H. Segan Ltd. Partnership v. Hasbro, Inc.,* 924 F.Supp. 512, 522 (S.D.N.Y. 1996) (quoting *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,* 933 F.2d 131, 137 (2d Cir.1991) (applying New York law)); *Allstate Ins. Co. v. Administratia Asigurarilor de Stat,* 948 F.Supp. 285, 296–97 (S.D.N.Y.1996) (Edelstein, J.); *Intercontinental Planning, Ltd. v. Daystrom, Inc.,* 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576 (N.Y.1969). Under New York's interest analysis, a court must consider five factors: (1) the place of contracting; (2) the place of the contract negotiations; (3) the place of the performance of the contract; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, places of incorporation, and places of business of the parties. *M.H. Segan,* 924 F.Supp. at 522; *Allstate,* 948 F.Supp. at 296–97; *see also State Trading Corp. of India, Ltd. v. Assuranceforeningen Skuld,* 921 F.2d 409, 417 (2d Cir.1990); Restatement (Second) of Conflict of Laws § 188(2) (1971).

### C. New York Law Governs the Instant Dispute

■ Applying New York law to the facts and the filings of the instant case, this Court finds that New York law governs this Court's resolution of the instant dispute. Two related findings support this conclusion.

First, the parties intended that New York law would govern their respective rights and duties under loan agreement. Both the August and April Commitment Letters state unequivocally that "[t]he Loan Agreement, the Note, the Leases and all related agreements, all of which shall be governed by New York law ...." (August Commitment Letter, ¶ C.1); (April Commitment Letter, ¶ C.1.) As plaintiff points out, although de-

fendants provided lengthy and detailed objections to both the August and April Commitment Letters, they raised no objection to the choice-of-law provision in Commitment Letter. (September 2 Letter (containing no objection to choice-of-law provision in Paragraph C.1 of April Commitment Letter)); (April 20, 1990 (containing no objection to choice-of-law provision in Paragraph C.1 of April Commitment Letter).)

As previously stated, contractual choice-of-law provisions are given effect in New York absent fraud or violation of public policy. *Pappas,* 96 F.3d at 593; Restatement (Second) Conflict of Laws § 187 (1971). Moreover, in matters concerning the validity of a contract involving $250,000 or more, Section 5–1401 of the New York General Obligations Law mandates that a choice-of-law provision in such contract designating that New York law govern the parties rights and duties be given binding effect, regardless of whether the contract bears a reasonable relation to New York. N.Y.Gen. Oblig.Law § 5–1401 (McKinney 1989). The documentation submitted by both parties unquestionably establishes that the draft commitment letters involve more than $250,-000, and that both parties intended that all rights and duties arising under their proposed agreement "shall be governed by New York law." *See* (August Commitment Letter); (April Commitment Letter). Moreover, defendants make no suggestion that they were fraudulently or otherwise improperly induced to include this term in the Commitment Letters. Accordingly, this Court finds that it should give effect to the parties' intent, and apply New York law to all disputes arising out of the parties' alleged contractual agreement.

Second, even if the choice-of-law provisions in the August and April Commitment Letters alone were insufficient to establish New York state law as the law relevant to the instant dispute, this Court finds that New York law applies to the case at bar under the "interest analysis" test set forth by both Section 188(2) of the Restatement and New York case law because New York has the most significant relationship with the occurrences giving rise to the cause of action. To reiterate, under New York's interest analysis, a court must consider five factors: (1) the place of contracting; (2) the place of the contract negotiations; (3) the place of the performance of the contract; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, places of incorporation, and places of business of the parties. *M.H. Segan,* 924 F.Supp. at 522; *Allstate,* 948 F.Supp. at 296–97; *see also State Trading Corp. of India,* 921 F.2d at 417; Restatement (Second) of Conflict of Laws § 188(2) (1971).

Turning to the first factor, plaintiff's Complaint makes clear that whether or not the parties ever formed a contract is part of the very controversy currently before the Court. (Complaint ¶ 17.) Accordingly, this Court cannot weigh this factor in its determination.

Similarly, this Court cannot consider the third factor—the place of performance of the contract. Plaintiff asserts that the alleged contract's place of performance is New York, where the loan was to be repaid, (Reply Memo at 6–7), while defendants claim that it is Texas, where the loan funds were to be disbursed to Regent. (Dfts.Memo at 73–74.) Despite the parties' assertions to the contrary, the August and April Commitment Letters fail to expressly state either that defendants were to repay plaintiff in New York, or that plaintiff was to disburse the loan funds in Texas. *See generally* (August Commitment Letter (containing no express language regarding location of repayment or disbursement of loan proceeds)); (April Commitment Letter (containing no express language regarding location of repayment or disbursement of loan proceeds).) According to the Restatement, where the location for repayment of a loan is ambiguous, "the state of the applicable law must be determined by the principles stated in § 188"—the same principles that govern general contractual choice-of-law questions in New York. Restatement (Second) Conflict of Laws, § 188 cmt. a (1971). Thus, the eventual outcome of this specific inquiry will be the same as the outcome of this Court's overall choice-of-law analysis.

This Court does find, however, that New York is undoubtedly the primary place of the

parties's contract negotiations. Although this Court recognizes that much of the parties' negotiations occurred via electronic means of communication such as telephone and fax, as plaintiff correctly states in its papers, "all of the face-to-face negotiations ... were conducted in either New York or Louisiana with one preliminary meeting in Florida." (Pltf.Memo at 6.) No meeting between the parties ever occurred in Texas. *Id.; see generally* (Deft.Memo at 72–73); (Jorgeson Aff.) This Court notes not only that defendants do not dispute this fact in any of the papers they submitted to this Court, but also that defendants' own submissions contain much of the evidence that supports this Court's conclusion.

For example, the affidavit submitted by Jorgeson, the CEO and President of defendant Regent, lists at least 4 meetings that he attended at PCC's offices in New York—two meetings on July 7, 1989, (Jorgeson Aff. ¶¶ 20, 24), a meeting on August 15, 1989, *id.* ¶ 34, and one the following day, August 16, 1989. *Id.* ¶ 35. Plaintiff similarly provides several letters written by Jorgeson to executives at PCC reference Jorgeson's various trips to New York for contract negotiation purposes. *See* (Affidavit of Frank H. Penski, *Philips Credit Corp. v. Regent Health Group, Inc.*, 90 Civ. 2838 (Aug. 1, 1994) Exhs. K, P.)

Other of defendant's exhibits offer similar evidence. Dr. Barry A. Shelby, the Louisiana physician involved with the SMPMC project, states that "[o]n August 15 and 16, 1990 *I attended meetings with PCC at its offices in New York.*" (Shelby Aff. ¶ 5 (emphasis added).) In addition, at least 3 of the affidavits submitted by defendant recount an "on-site" meeting between the parties in Houma, Louisiana: (1) Jorgeson, (Jorgeson Aff. ¶¶ 17–18); (2) Shelby, (Shelby Aff. ¶ 7); and (3) Blieberg. (Blieberg Aff. ¶ 4.) Tellingly, none of the affidavits filed by defendant regarding this motion contain any reference to or suggestion of any meeting between the parties in Texas. *See generally* (Jorgeson Aff.); (Shelby Aff.); (Blieberg Aff.); *see also* (Dfts.Memo at 72–73.)

Regarding the location of the subject matter of the contract, the location of the collateral that secures a contract for the re-

payment of money typically determines the location of the subject matter of the contract. *See In re McCorhill Publishing*, 86 B.R. 783, 793 (S.D.N.Y.1988). Both draft commitment letters expressly state that all funds advanced by plaintiff to defendants

> shall be secured by a first priority lien on and security interest in all now existing or hereafter acquired assets of [Defendants], both tangible and intangible, including but not limited to all accounts receivable, licenses, contract rights, equipment, general intangibles, real property, personal property and all other assets relating to the Hospital.

(August Commitment Letter, ¶ A.5.A); (April Commitment Letter, ¶ A.5.A.) As with the choice-of-law provisions contained in both draft commitment letters, defendants raised no objection to this security provision. (September 2 Letter (containing no objection to Paragraph A.5.A.) (April Jorgeson Letter (containing no objection to Paragraph A.5.A).) There is no question that the hospital that defendants planned to build with plaintiff's funds was to be in Houma, Louisiana. Accordingly, this Court finds that Louisiana is the location of the subject matter of the contract.

Finally, this Court observes that plaintiff is a Delaware corporation with its principal place of business in New York City. (Complaint ¶ 1); *see* (Answer ¶ 1.) Defendant is a Texas corporation with its principal place of business in Austin, Texas. (Complaint ¶ 2); (Answer ¶ 2.)

This Court finds that the combined effect of the ascertainable factors of the "interest analysis" test renders New York the state with the most significant relationship with the occurrences giving rise to the cause of action. To summarize, three states have at least some relation to the instant cause of action: (1) Louisiana, the place of performance of the contract; (2) Texas, the place of defendant Regent's incorporation and principal place of business; and (3) New York, the place of contract negotiation, and the place of plaintiff's principal place of business. Thus, New York, with two contacts, has the most contacts to the contract dispute at bar. Moreover, when these factors are coupled

with the parties' express and undisputed intention that all rights and duties arising under their proposed agreement "shall be governed by New York law," it is clear that the State of New York has the most significant relationship with the parties and the transactions at issue.

The instant case is very similar to *Frutico S.A. de C.V. v. Bankers Trust Co.*, 833 F.Supp. 288 (S.D.N.Y.1993). Plaintiff Frutico sued lender Bankers Trust Company ("BTC") for the purported breach of an alleged agreement in which BTC was to make $2,265,000 available to Frutico in the form of either a loan or an investment ("the Alleged Agreement"). *Id.* at 291. During the course of discussions between BTC and Frutico, "numerous drafts of documents reflecting the proposed transactions were circulated among the parties." *Id.* at 294. These drafts "explicitly required the execution of written agreements before there would be any enforceable agreement among the parties," language to which neither party objected. *Id.* In addition, one of these drafts and several underlying short-term notes specifically designated New York law as the law governing the agreements and notes. *Id.* at 296.

During contract negotiations, BTC decided not to proceed with the contract. *Id.* at 295. Although BTC claimed that its decision "was purely economic," Frutico attributed it "to a general policy of not continuing loans to Latin America in light of . . . noneconomic considerations." *Id.* Frutico filed suit against BTC in Texas state court, *id.* at 291, alleging breach of contract, promissory estoppel, fraud, negligent misrepresentation, breach of duty of good faith and fair dealing, breach of fiduciary duty, and *prima facie* tort. *Id.* at 297, 299–301. The case subsequently was removed to the United States District Court for the Southern District of Texas, transferred to the Southern District of New York, and assigned to Judge Sweet. *Id.* at 291.

Defendant BTC moved for an order granting summary judgment in its favor and dismissing plaintiff's complaint in its entirety. *Id.* Before considering the merits of this motion, Judge Sweet decided the preliminary matter of "which law to apply in interpreting the enforceability of the Alleged Agree-

ment"—the law of Texas or the law of New York. *Id.* at 295. After reviewing the basic rules regarding choice-of-law for federal courts sitting in diversity, Judge Sweet stated that because the case had been transferred from another forum, he was bound to apply the choice of law rules of the transferor forum—Texas. *Id.* According to Judge Sweet, "Texas courts, like those in New York, employ the 'substantial relationship' or 'significant contacts' test in deciding choice of law questions" with respect to actions sounding in both tort and contract." *Id.* at 295–96.

Applying the substantial relationship test to the facts before him, Judge Sweet found that "the substantive law of the State of New York is controlling." *Id.* at 296. He explained his decision as follows:

> The parties intended that New York law would govern the transactions covered by the Alleged Agreement. The December 22 Draft explicitly states: "This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its law governing the conflict of laws.
>
> \* \* \* \* \* \*
>
> The Plaintiffs are located in Texas and Mexico, and Valentine, who controls all three, maintained residences at relevant times in California, Colorado, and Mexico. The Defendants are incorporated in New York. The negotiations surrounding the Alleged Agreement took place in New York, with Valentine travelling to New York City at least twice to discuss the proposed transactions. Furthermore, the Short–Term Loans were repaid in New York, and the payments to the Defendants required by the Alleged Agreement were to be made in New York as well.
>
> Finally, the Defendants allegedly tortious acts of commission and omission with regard to the negotiations, the terms and conditions of the Alleged Agreement, and the Defendants' purported breach of the Alleged Agreement are asserted to have taken place in New York.

*Id.* at 296.

In light of the choice-of-law provision in the August and April Commitment Letters,

the contacts between the state of New York and the events underlying the instant action, and the similarities between the facts of this case and the *Frutico* case, this Court finds that New York law controls this court's resolution of the plaintiffs motion for summary judgment. and defendants' counterclaims. Defendants' various assertions to the contrary do not require a different result.

■ For example, defendants' claim that the choice-of-law rules applicable to tort cases govern this Court's resolution of at least some of the issues in the instant dispute is meritless. Throughout their papers, defendants assert not only that an enforceable agreement between the parties existed, (Dfts.Memo at 77–100), but also that plaintiff made misrepresentations to defendants during the course of the parties' negotiations upon which defendants relied to their detriment. *Id.* at 100–17. Because defendants thus rely on both contract principles and tort law in support of their underlying claims, they maintain that the choice-of-law rules applicable to both contract and tort law are relevant to this Court's resolution of the instant choice-of-law dispute. *Id.* at 72–76. This Court reiterates, however, that "[t]he effect of misrepresentation, duress, undue influence and mistake upon a contract is determined by application of the rules §§ 187–188." Restatement (Second) Conflict of Laws § 201 (1971). Thus, this Court's choice-of-law analysis regarding both the contact claims raised by each party, and the misrepresentation claims raised by defendants, are properly resolved under only the "interest analysis" test set forth in both Section 188 of the Restatement and relevant New York case law.

Moreover, under the "interests test," New York remains the state with the most significant contacts to defendant's various claims. Plaintiff's allegedly tortious acts of commission and omission regarding the parties' alleged contract are asserted to have taken place in New York. For instance, throughout their counterclaims, defendants allege that "PCC made numerous material representations to Regent...." (Dfts.Memo at 100, 103, 106–07, 111, 113.) It is undisputed both that no meeting regarding the SMPMC project ever occurred in Texas, *id.* at 72–73; (Pltf.Memo at 6), that several meetings regarding the Project and the Contract took place in New York, (Jorgeson Aff. ¶¶ 20, 24, 34–35), and that plaintiff's telecommunications with defendant emanated from New York. As in *Frutico,* 833 F.Supp. at 296, because any misrepresentations that plaintiff allegedly made were made in New York, this Court finds that New York has the most significant relationship with the occurrences underlying defendant's misrepresentation claim. Accordingly, this Court finds that New York law governs this Court's resolution of these claims.

## II. Plaintiff's Motion for Summary Judgment

The instant motion for summary judgment revolves around the question whether an enforceable agreement existed between the parties. This Court briefly will review the law governing motions for summary judgment before addressing the parties' competing claims regarding the instant motion.

### A. Rule 56

Pursuant to Rule 56, summary judgement is appropriate where "the pleadings, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Scottish Air Int'l, Inc. v. British Caledonian Group, PLC.,* 867 F.Supp. 262, 265 (S.D.N.Y.1994), and the party may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue which that party would have the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). As the Second Circuit has noted, "all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the

motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988); *see also Celotex,* 477 U.S. at 330 n. 2, 106 S.Ct. at 2556 n. 2.

██ To defeat a motion for summary judgement, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Resolution Trust Corp. v. Hidden Ponds Phase IV Dev. Assocs.,* 873 F.Supp. 799, 804 (E.D.N.Y.1995). Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Scottish Air,* 867 F.Supp. at 266. If the adverse party does not respond to the motion for summary judgement, "summary judgement, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e). Such an entry of summary judgment is inappropriate, however, "[w]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, ... even if no opposing evidentiary matter is presented." Fed.R.Civ.P. 56(e) advisory committee's notes (1963 amendment).

██ The existence of a genuine issue of material fact depends on both the genuineness and the materiality of the issues raised by the motion. *See Scottish Air,* 867 F.Supp. at 266. To evaluate a fact's materiality, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). While "disputes over facts that might affect the outcome of a suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citations omitted); *see Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11–12 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). To evaluate the genuineness of a material fact, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to re-quire a judge or jury to resolve the parties' differing versions of the truth at trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510 (quotation omitted).

**B. The Parties' Competing Summary Judgment Claims**

In its motion for summary judgment, plaintiff claims that under New York law, the undisputed facts of this case establish that no enforceable contract exists between the parties. (Pltf.Memo at 1–2) (Reply Memo at 10–11.) In support of this claim, plaintiff asserts that (1) execution of a written contract was essential to the agreement between the parties, (Pltf.Memo at 17), and (2) any alleged oral agreement between the parties is unenforceable under the statute of frauds. *Id.* at 37.

Defendants reject plaintiff's claims and contend that PCC and defendants entered into an enforceable preliminary agreement with respect to the major terms of the SMPMC project. (Dfts.Memo at 77.) Defendants offer two alternative theories in defense of their position: (1) under Texas law, an enforceable contract exists, *id.* at 77; (2) under New York law, there are triable issues of fact regarding the existence of enforceable preliminary agreement, and PCC's intent to be bound by that agreement. *Id.* at 85.

In addition, defendants argue that the six counterclaims contained in their answer render inappropriate an award of summary judgment to plaintiff. *Id.* at 100–23. Five of defendants' counterclaims allege causes of action under both Texas and New York law: (1) intentional misrepresentation, *id.* at 100–107; (2) negligent misrepresentation, *id.* at 108–11; (3) promissory estoppel, *id.* at 118–120; and (4) tortious interference with business relations. *Id.* at 121–23. Defendants also raise a sixth counterclaim under only Texas law—that plaintiff has violated the Texas Deceptive Trade Practices Act. *Id.* at 112–18.[2]

As an initial matter, this Court finds that all claims asserted by defendants pursuant to Texas state law are meritless. As this Court found above, the law of the State of New York—not Texas—controls this Court's reso-

lution of the all of the parties' respective claims in the instant dispute. Accordingly, this Court finds that the following claims raised by defendants should be denied: (1) that under Texas law, an enforceable contract exists between the parties; (2) that plaintiff has violated the Texas Deceptive Trade Practices Act; and (3) that plaintiff is culpable of intentional misrepresentation, negligent misrepresentation, promissory estoppel, and tortious interference with business relations, pursuant to Texas law. Consequently, this Court will address only those claims raised by the parties, pursuant to New York state law. This Court will first resolve the parties' competing claims regarding the subject matter of plaintiff's Complaint—the existence of an enforceable contract between the parties—before moving on to the merits of defendants' various counterclaims.

*1. Existence of an Enforceable Agreement.*

According to plaintiff, "Second Circuit authority establishes that an after-the fact claim that an enforceable contract was formed at some point during oral negotiations, or in the absence of a formal agreement, ... may be resolved as a matter of law." (Pltf.Memo at 17.) Plaintiff thus asserts that defendants' "claim that an oral agreement exists between the parties is particularly susceptible to resolution on a motion for summary judgment." *Id.* at 18. Plaintiff states that both the documentary and testimonial evidence submitted to this Court establishes that the parties did not intend to be bound absent a written agreement. Id.

Plaintiff explains that under New York law, "when parties to a proposed agreement 'do not intend to be bound by an agreement until it is in writing and signed, then there is no contract.'" *Id.* at 19. In order to determine this intent, the Second Circuit has provided a list of factors for courts to consider to determine whether "the parties' words and deeds, within a given bargaining context show an intent to be bound only by a written agreement." *Id.* at 23. Plaintiff states that these factors include: (1) whether a writing is contemplated merely as a memorial; (2) whether the contract needs a formal writing

for its full expression; (3) any acts of partial performance by one party accepted by the other; (4) the number of terms agreed upon compared to the total number to be included; (5) whether any terms remain to be negotiated; (6) whether the contract has few or many details; (7) whether the amount involved is large or small; (8) whether the standard form is widely used in similar transactions or whether this is an unusual type of contract; (9) the simplicity or complexity of the transaction; (10) the degree of formality attending similar transactions; (11) usage and custom in the industry; (12) subsequent conduct and interpretation by the parties themselves; (13) the speed with which the transaction must be concluded; (14) the availability of information necessary to decide whether to enter into a contract; (15) the time when the contract was entered into; and (16) the relationship of the parties. *Id.* at 23–24. Plaintiff contends that "most if not all" of these factors weigh heavily in PCC's favor in this case, and should "lead[ ] this Court to the inevitable conclusion that no enforceable contract exists." *Id.* at 29.

In the alternative, plaintiff argues that even if Philips did enter into an oral contract with defendants, that contract would be unenforceable under the Statute of Frauds. *Id.* at 37. According to plaintiff, New York law requires a signed writing to render enforceable both (1) an agreement to lend money which is secured by a mortgage on real property, and (2) an agreement which by its terms cannot be performed within one year. *Id.* at 38. Plaintiff claims that the alleged oral agreement in the instant case meets both of these criteria. *Id.* at 37. Plaintiff explains that both the August and the April Commitment Letters "expressly provide that the loan and the note shall be secured by a lien on all of Sugar Mill's assets including real property," *id.* at 39, as well as obligate PCC to finance defendants leased equipment for sixty (60) months, or five years. *Id.* at 41. Thus, even if this Court determines that the parties entered into an oral contract, plaintiff asserts that such contract would be unenforceable under both provisions of the statute of frauds.

Defendants dispute both of plaintiff's arguments. They argue that "Regent has set forth evidence showing that there are material issues of fact as to the existence of an enforceable agreement, and PCC's intent to be bound by that agreement. (Dfts.Memo at 85.) According to defendants, New York law holds that even if parties intend to formalize an agreement, the absence of a final formal document does not prevent the enforceability of the agreement. "[i]f the parties have settled on the contract's substantive terms...." *Id.* at 86. Defendants assert that applying the Second Circuit's test for determining whether a preliminary agreement evinced an intent to be bound to the facts of this case demonstrates that PCC intended to be bound to the agreement proposed on July 17, 1989. *Id.* at 88–96. Moreover, defendants declare "the major terms [of the parties' alleged agreement] were agreed to in July 1989, were approved by the PCC President and Credit Committee at that time, were repeatedly reaffirmed by PCC personnel and were not re-visited in the correspondence or negotiations between the parties between July, 1989 and March 1990." *Id.* at 92–93.

Defendants also dispute plaintiff's statute-of-frauds argument. *Id.* at 97. Defendants claim that the statute of frauds is satisfied in the instant case because

> the approval of the transaction by PCC's President and its Credit Committee, the Credit Committee's memorandum to Mr. Blieberg, Mr. Blieberg's memorandum dated July 17, 1989, and Mr. Blieberg's subsequent written reaffirmation of the existence of the transaction and PCC's intent to be bound, taken together, clearly state the essential terms of the contract and are signed by persons authorized to speak for PCC. "It is black-letter law that an agreement satisfying the statute of frauds may be evidenced by piecing together various writings....

*Id.* at 98 (citation omitted.)

Defendants further claim that plaintiff is equitably estopped from asserting the statute-of-frauds defense. *Id.* at 98. Defendants explain that PCC misrepresented its intent to be bound, that defendants reasonably relied upon and acted upon these mis-

representation, and that defendants suffered damage as a result of their reliance. *Id.* at 98–99. Because "[t]he statute of frauds 'should not be used as a means of perpetrating; rather than preventing, deceptive behavior,'" defendants urge that plaintiff be estopped from raising the statute of frauds as a defense. *Id.* at 99.

The parties' competing contract claims focus on three issues: (1) whether the parties reached a preliminary agreement; (2) whether the parties intended to be bound absent a signed, written agreement; and (3) whether, even if the parties entered into an enforceable oral agreement, that agreement is valid under the statute of frauds. Because the same principles govern the first two issues, this Court will review them together before moving on to the statute of frauds.

### a. Rules governing the existence of binding contractual agreements.

Under New York law, "if parties do not intend to be bound by an agreement until it is in a writing and signed, then there is no contract until that event occurs." *R.G. Group v. Horn & Hardart Co.,* 751 F.2d 69, 74 (2d Cir.1984); *see Scheck v. Francis,* 26 N.Y.2d 466, 311 N.Y.S.2d 841, 842, 260 N.E.2d 493, 493–94 (1970). "[T]his rule holds true even if the parties have orally agreed upon all terms of the proposed contract." *R.G. Group.,* 751 F.2d at 74; *see Schwartz v. Greenberg,* 304 N.Y. 250, 107 N.E.2d 65 (1952).

On the other hand, "where there is no understanding that an agreement should not be binding until reduced to writing and formally executed, and '[w]here all the substantial terms of the contract have been agreed on, and there is nothing left for future settlement,' then an informal agreement can be binding even though the parties contemplate memorializing their contract in a formal document." *R.G. Group.,* 751 F.2d at 74 (citations omitted). The point of these rules is to give parties the power to contract as they please, so that they may, if they like, bind themselves orally or by informal letters, or that they may maintain 'complete immunity from all obligation', until a written agree-

ment is executed." *Id.;* 1 Corbin on Contracts § 30, at 98 (1963). What matters to a court's determination of the existence of a contract "are the parties' expressed intentions, the words and deeds which constitute objective signs in a given set of circumstances." *R.G. Group,* 751 F.2d at 74.

The Second Circuit has noted that

[m]any modern business transactions could not be carried out unless the parties were able to rely on oral promises or informal writings, such as letters, memos, and faxes. A stock market transaction or insurance coverage by verbal binder are examples. In other, more complex transactions, negotiations would be chilled were a person later to be held bound by every chance promise made. In such situations, the legal obligation must await the execution of a formal written agreement—so the party may be assured that all proper precautions were taken before it was legally committed.

*Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 570 (2d Cir.1993).

The Second Circuit long has recognized the reasons for applying these principles in "substantial and complex" business dealings. According to the court,

[f]reedom to avoid oral agreements is especially important when business entrepreneurs and corporations engage in substantial and complex dealings. In these circumstances there are often forceful reasons for refusing to make a binding contract unless it is put in writing. The actual drafting of a written instrument will frequently reveal points of disagreement, ambiguity, or omissions which must be worked out prior to execution. Details that are unnoticed or passed by in oral discussion will be pinned down when the understanding is reduced to writing. These considerations are not minor indeed, above a certain level of investment and complexity, requiring written contracts may be the norm in the business world, rather than the exception.

*Id.* at 75.

■ The Second Circuit's concerns regarding oral contracts are expressed in a list of the factors that courts most commonly look to in deciding whether parties' words and deeds within a given bargaining context, show an intent to be bound only by written agreement. *Id.* These factors are: (1) the number of terms agreed upon compared to the total number to be included, (2) the relationship of the parties, (3) degree of formality attending similar contracts, (4) acts of partial performances by one party accepted by the other, (5) usage and custom of the industry, (6) subsequent conduct and interpretation by the parties themselves, (7) whether writing is contemplated merely as a 'memorial,' (8) whether contract needs a formal writing for its full expression, (9) whether any terms remain to be negotiated, (10) whether contract has few or many details, (11) whether amount involved is large or small, (12) whether a standard form is widely used in similar transactions or whether this is an unusual type of contract, ... (13) the speed with which the transaction must be concluded, (14) the simplicity or complexity of the transaction, (15) the availability of information necessary to decide whether to enter into a contract, and (16) the time when the contract was entered into. *Consarc,* 996 F.2d at 575–76. Although no single factor is decisive, each provides significant guidance. *Id.; R.G. Group,* 751 F.2d at 75.

Despite "the importance of recognizing the freedom of negotiating parties from binding obligations," there are instances where a manifestation of preliminary assent amounts to a legally binding agreement. *Teachers Ins. & Annuity Ass'n v. Tribune Co.,* 670 F.Supp. 491, 497 (S.D.N.Y.1987). In *Teachers Annuity,* Judge Leval noted that "[p]reliminary contracts with binding force can be of at least two distinct types." *Id.* at 498. "One occurs when the parties have reached complete agreement (including the agreement to be bound) on all issues perceived to require negotiation." *Id.* The second sort of preliminary agreement—"the binding preliminary commitment"—"is one that expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated." *Id.* at 498.

Judge Leval explained the difference between these two types:

The first type binds both sides to their ultimate contractual objective in recognition that that contract has been reached, despite the anticipation of further formalities. The second type—the binding preliminary commitment—does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the alternate objective within the agreed framework. In the first type, a party may lawfully demand performance of the transaction even if no further steps have been taken following the making of the "preliminary" agreement. In the second type, he may not. What he may demand, however, is that his counterparty negotiate the open terms in good faith toward a final contract incorporating the agreed terms. This obligation does not guarantee that the final contract will be concluded if both parties comport with their obligation, as good faith differences in the negotiation of open issues may prevent a reaching of final contract. It is also possible that the parties will lose interest as circumstances change and will mutually abandon the negotiation. The obligation does, however, bar a party from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.

*Id.*

Judge Leval noted that it often will "be difficult for a court to determine whether a preliminary manifestation of assent should be found to be a binding commitment." *Id.* He stated, however, that the factors provided by the Second Circuit "as relevant to a determination whether final contracts had been reached in preliminary form are also relevant to determination whether preliminary commitments are to be considered binding." *Id.* at 498–99. Although several of these factors, such as the existence of open terms, are applied differently in one analysis than the other, a court's task remains the same regardless of which inquiry it undertakes, namely "to determine the intentions of the parties at the time of their entry into the

understanding, as well as their manifestations to one another by which the understanding was reached." *Id.* at 499. Judge Leval cautioned, however, that "[t]here is a strong presumption against finding a binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents." *Id.*

*i. Whether a binding preliminary agreement existed between the parties*

 Defendants maintain that a binding preliminary agreement existed between themselves and PCC. They claim that "Regent and PCC reached such preliminary agreement on July 14, 1989, the terms of which were set forth in PCC's memorandum of July 17, 1989." (Dfts.Memo at 87.) Reviewing this memorandum and other relevant documentation in the light most favorable to defendants, this Court finds that defendants' position is unsupported by relevant case law.

To reiterate, on July 7, 1989, defendants and PCC met in New York "to negotiate the terms and conditions regarding the Sugar Mill transaction in Houma, Louisiana between Regent Health Care and PCC." Memorandum to J. Walter Corcoran from W.G. Blieberg (June 29, 1989); (Jorgeson Aff. ¶ 20); (Dfts.Memo at 20.)

According to defendants,

[b]y the end of the meeting, PCC and Regent had reached agreement on the major terms of the transaction. Mr. McKinney stated that the terms agreed to during that meeting would be presented to the PCC Credit Committee for approval, and that he and Mr. Corcoran had decided to recommend to the Credit Committee that PCC finance the entire project. Mr. McKinney stated that if the Credit Committee approved the transaction, that would constitute a "formal commitment" by PCC to do the transaction on those terms.

(Jorgeson Aff. ¶ 22); *see* (Dfts.Memo at 20.)

Defendants explain that that same day, Jorgeson and Bell also met with various individuals on PCC's Credit Committee. *Id.* ¶ 24; (Dfts.Memo at 22.). Jorgeson states that "[a]fter meeting with these individuals,

Mr. McKinney informed Mr. Bell and me that the project would be submitted to the PCC Credit Committee the following week and that, if approved, PCC would prepare a written document which would reflect the terms of the transaction as approved by the Credit Committee." (Jorgeson Aff. ¶ 24); see (Dfts.Memo at 22.)

Defendants state that on July 13, 1989, PCC's Credit Committee approved the Loan. (Jorgeson Aff. ¶ 25); see (Dfts.Memo at 22–25.) On July 14, 1989, Wynn Blieberg telephoned Jorgeson to inform Jorgeson that the PCC Credit Committee had approved the transaction, to orally explain "the general terms which had been approved by the Credit Committee." (Blieberg Aff. ¶ 6); see (Dfts.Memo at 26.)

On July 17, 1989, Blieberg "prepared a memorandum setting forth the terms as presented to and approved by the Credit Committee ... on behalf of the Credit Committee." (Blieberg Aff. ¶ 7); see (Dfts.Memo at 29); (Blieberg Memo.) The Blieberg Memo lists the terms of financing for both the equipment and the mortgage for the SMPMC, then instructs the PCC legal department to "prepare a commitment letter for this transaction as soon as possible" for transmission to Jorgeson. Id. at 1–2. The Blieberg Memo then states that "upon return of the commitment letter, the customer is required to remit" a deposit on the Mortgage. Id. at 2. On August 8, 1989, Corcoran on behalf of PCC, informed Regent and SMPMC that PCC "[wa]s considering a loan" to SMPMC in the amount of $10,850,000. (August 8 Letter at 1.) The letter expressly stated that the Loan, "if approved," was subject to various terms and conditions. Id. Ten days later, PCC transmitted the August Commitment Letter to defendants. (August Commitment Letter.)

Neither the undisputed facts, nor those advanced solely by defendants, support a finding that the parties reached a binding preliminary agreement. For example, Jorgeson and defendants' version of the parties' face-to-face negotiations on July 7, 1989, supports only the conclusion that the parties' engaged merely in preliminary negotiations on that day, and that PCC gave defendants no assurances regarding PCC's ultimate decision either to go forward with the transaction or the terms which the transaction would include if closed. Jorgeson repeatedly states that PCC representatives told him that the project "would be presented to the PCC Credit Committee," (Jorgeson Aff. ¶¶ 21, 22, 24 (emphasis added)), that the Credit Committee had to approve the SMPMC project, id. ¶¶ 21, 22, 24, and that "if approved PCC would prepare a document which would reflect terms of the transaction as approved by the Credit Committee." Id. ¶ 24 (emphasis added). Jorgeson, in his own words, thus admits the conditional nature of the parties' agreement, PCC's need to obtain "future approvals" of the deal and its terms, and the fact that PCC "expressly anticipate[d] future preparation and execution of contract documents." Teachers Ins., 670 F.Supp. at 499.

Blieberg's July 14, 1989, telephone call does not change the nature of the parties' negotiations. As defendants explain, Blieberg phoned to inform Jorgeson that the PCC Credit Committee had approved the transaction and to orally provide Jorgeson "the general terms" upon which the Credit Committee had approved the deal. (Dfts.Memo at 22–25.) Defendants do not claim that Blieberg represented to them that the financing no longer required a formal writing, or that Blieberg expressed to Jorgeson the exact details and terms of the entire transaction.

In addition, defendants mistakenly rely on the July 17, 1989 memorandum by Blieberg. It is undisputed that the Blieberg Memo was an "internal PCC memoranda," sent only to PCC employees involved with the SMPMC negotiation, and that defendants obtained the Blieberg Memo only through "PCC's document production," during discovery. (Dfts.Memo at 29, 88.) As Judge Leval cautioned, a court determines the intentions of the parties to an alleged agreement by "determining the intentions of the parties at the time of their entry into the understanding, as well as their manifestations to one another by which the understanding was reached." Teachers Ins., 670 F.Supp. at 499 (emphasis added). A document first obtained by defendants during discovery com-

menced by the parties after November 12, 1991—the date this Court denied plaintiff's motion for summary judgment because the parties had not yet engaged in discovery—is unquestionably irrelevant to this Court's determination of the parties' intent in July 1989.

The August 8, 1989, letter from Corcoran to Jorgeson similarly undercuts defendants' position. As quoted earlier, Corcoran's letter informed Jorgeson that PCC "was *considering* a loan" to finance the SMPMC project. (August 8 Letter at 1 (emphasis added).) The letter then expressly states that "*if approved,*" the Loan was subject to numerous terms and conditions. *Id.* (emphasis added). Finally, the letter concludes by stating that "[i]f the foregoing terms and conditions *provide a basis* for funding this project, please call to arrange a meeting where you and the principals of the Borrower *may discuss all of the issues raised by this letter.*" *Id.* at 3 (emphasis added).

By its plain terms, the August 8 Letter is a conditional invitation to defendants to bargain with plaintiff over the terms of PCC's proposed financing for the SMPMC project. Like the July 8 Letter, it "call[s] for future approvals and expressly anticipate[s] future preparation and execution of contract documents." *Teachers Ins.,* 670 F.Supp. at 499. Accordingly, it most clearly is not a preliminary contract with binding force. Having thus reviewed the facts relied upon by defendants in support of their in support of their position, in the light most favorable to defendants' position, this Court finds that no preliminary agreement with binding force existed between the parties during the time period asserted by defendants.

### ii. Whether a contract exists absent a signed writing

This Court now turns to the question whether a contract to finance the SMPMC project exists absent a signed writing. Applying the principles set forth by the Second Circuit to the facts of the instant case, and viewing these facts in the light most favorable to defendants, the non-moving parties, this Court finds that the facts unequivocally support plaintiff's position.

As an initial matter, this Court notes that, in the Second Circuit, "considerable weight is put on a party's explicit statement that it reserves the right to be bound only when a written agreement is signed." *R.G. Group,* 751 F.2d at 75. The language of both the August and April Commitment Letters contain an express reservation by Philips of its right to be bound only if the commitment letter is "duly executed and accepted" by Regent and Sugar Mill within ten days of the date of the letter, (April Commitment Letter ¶ C.13); (August Commitment Letter ¶ C.6.), as well as signature lines indicating that the individual executing the documents "ACCEPTED AND AGREED" to them. (April Commitment Letter at 13); (August Commitment Letter at 10.) Moreover, both commitment letters by their terms "automatically expire" if not executed by defendants and received by PCC within ten days. (April Commitment Letter ¶ C.13); (August Commitment Letter ¶ C.6.) As the Second Circuit has noted "[c]ourts are reluctant to discount such a clear signal, and it does not matter whether the signal is given during the course of bargaining, or at the time of the alleged agreement." *R.G. Group,* 751 F.2d at 75; *see also Chrysler Capital Corp. v. Southeast Hotel Prop.,* 697 F.Supp. 794, 801 (S.D.N.Y.1988). Defendants have suggested no reason to depart from this long-standing principle, and this Court finds no reason to so on its own.

Turning to the remaining fifteen elements, this Court will address them *seriatim.* The two factors concerning the number of terms agreed upon compared to the total number to be included, and whether any terms remain to be negotiated, clearly fall in plaintiff's favor. As noted above, the terms of the August and April Commitment Letters cover ten and thirteen single-spaced pages, respectively. As defendants' own submissions highlight, even defendants believed that both of these documents were riddled with unsettled terms. For instance, Jorgeson himself gave testimony establishing that the parties were still negotiating items such as the prepayment terms, the definition of net-profits, and PCC's profit participation in the event

that SMPMC was sold at a loss. (Jorgeson Dep. at 366–84, 389–414.)

Moreover, defendants' responses to the August and April Commitment Letters lists in great detail the terms that defendants deemed unsettled. Jorgeson's response to the August Commitment Letter contains approximately five pages of "modifications and clarifications." As recited earlier in this opinion, Jorgeson and Regent objected to or requested additional information regarding at least seventeen separate items in the August Commitment Letter, including (1) the interest rates, (2) the amortization period, (3) the "Rule of 78's" methodology, (4) the prepayment penalty calculation, (5) the contingent interest provision, (6) the provision regarding the pledge of the partnership interests in the SMPMC, (7) the requirement that the SMPMC partners evidence their commitment to invest additional equity to cover cost overruns and cash flow shortfalls, (8) the commitment fee, (9) estimated costs and expenses, and (10) Regent's deadline for accepting the commitment. (Letter from Brent W. Jorgeson, President, Regent Health Group Inc., to J. Walter Corcoran, President, Philips Credit Corp., at 1–5 (Sept. 2, 1989).)

Jorgeson's letter to PCC in response to the April Commitment Letter similarly provided a laundry list of unresolved issues. To reiterate, in the April 20, 1990, letter, Jorgeson informed Corcoran that defendants "were very dismayed and disappointed when [they] received [the April Commitment Letter]." (Letter from Brent W. Jorgeson, President, Regent Health Group, Inc., to J. Walter Corcoran, President, Philips Credit Corp., at 1 (April 20, 1990).) Jorgeson asserted that the April Commitment Letter "contained numerous material changes from the business points that have been the basis for this transaction since last summer and fall," several of which "cut right to the heart of the deal" and were "known by [PCC] to have been unacceptable in any such form all along." *Id.* Jorgeson listed several of these changes, such as (1) the guarantees required of the limited partners, (2) PCC's fee, (3) PCC's interest charges, and (4) PCC's intention to calculate the floating rate of interest accord-

ing to the Rule of 78's, *id.*, and attached an "Amendment" specifically outlining all of its concerns regarding the April Commitment Letter. *Id.*, Amendment A. This Court observes that Jorgeson's "Amendment A" provides an approximately six-page list of at least fifteen terms to which defendants objected, accompanied by defendants' proposed remedy for each term. *Id.* The disputed terms concerned such topics as interest rates and calculation, prepayment penalties, limited partner guarantees, construction commencement date, equipment lessor, orders, and contracts, limitations on distributions, the pre-conditions to closing, and supersession and consequential damages. *Id.* This Court restates that defendants were so "dismayed and disappointed" by the number and character of unresolved issues of the parties' alleged agreement that Jorgeson, on behalf of defendants, informed PCC of defendants' intention to resort to legal action if defendants did not "within ten days from the date of this letter receive a commitment from [PCC] that reflect[ed] each of the changes required in the Amendment." *Id.* at 2.

As defendants' own correspondence reveals, the terms that remained unsettled throughout the negotiation process were numerous, complex, and "cut right to the heart of the deal." Jorgeson's threat to resort to legal action if the terms of the April Commitment Letter were not "amended" to conform to defendants' proposed specifications particularly underscores this point. This Court therefore finds that this factor unequivocally supports plaintiff's claim that no contract between the parties existed.

This Court's examination of the parties' relationship further supports plaintiff's position. The facts are clear that the parties had no prior relationship, business of otherwise—the proposed financing of the SMPMC project was their first interaction. In addition, the documentation submitted by the parties reveals that the entire history of the SMPMC transaction is one of protracted and often discordant negotiation. Moreover, as plaintiff correctly states, throughout PCC's relationship with defendants, there were repeated references to the written commitment letter in both parties' correspondence, and

there is no evidence that Philips ever agreed to drop the writing requirement. *See* (Dfts.Memo at 29–30.) Thus, there is no history, recent or otherwise, to suggest either that plaintiff intended, or that defendants had reason to believe that plaintiff intended, to be bound to a transaction such as this absent a formal, signed writing.

The factors focusing on (1) the degree of formality attending similar contracts, (2) the usage and custom of the industry, (3) the use of a standard form, (4) the amount involved, and (5) the simplicity or complexity of the transaction, all also unquestionably support plaintiff's claims. The proposed SMPMC financing involved a $10.85 million loan and a $5 million lease commitment which contemplated a note, complex interest and payment terms, amortization schedules, balloon payments, equity requirements, security and credit requirements, fees, leases and a host of other complex requirements and conditions. *See generally* (April Commitment Letter); (August Commitment Letter). Comparing these terms to those considered by other courts in this jurisdiction, this Court finds that the alleged oral agreement in this action is exactly the type of large and sophisticated transaction that lenders and borrowers typically make in a signed, formal writing. *See R.G. Group*, 751 F.2d at 77 (finding that a franchise agreement requiring an initial investment of $2 million "is the type of agreement where it would be unusual to rely on an oral understanding"); *Frutico*, 833 F.Supp. at 298–99 (finding that a proposed $2.265 million loan/investment involved "significant sums of money," and was the type of "substantial and complex dealing[ ]" typically committed to writing); *Chrysler*, 697 F.Supp. at 795, 803–04 (finding that a note financing $19,750,000 to purchase hotels was the type of transaction regularly committed to a signed writing). As a result, this Court finds that the absence of a formal, signed writing in this case supports plaintiff's claim that no enforceable contract existed between the parties.

Turning to the factor whether any acts of partial performance by one party were accepted by another, this Court finds that there were none. Relevant New York case law holds that "partial performance requires that one party confer something of value on the other party which that party accepts," and that "mere preparatory acts are not partial performance." *Shearson Lehman CMO, Inc. v. TCF Banking & Savings, F.A.*, 710 F.Supp. 67, 71 (S.D.N.Y.1989); *see R.G. Group*, 751 F.2d at 75–76. Moreover, necessary acts taken in furtherance of negotiations, do not count as partial performance. *P.A. Bergner &.Co. v. Martinez*, 823 F.Supp. 151, 157 (S.D.N.Y.1993). Throughout their papers, defendants repeatedly assert that they partially performed their alleged contract with PCC by "expend[ing] substantial sums of money and several months of man-hours" to respond to PCC's information and document requests, and to cooperate with PCC's due diligence efforts. (Dfts.Memo at 42–56, 93–94.) Such acts however, are merely "necessary steps taken in furtherance of negotiation," and thus constitute preparation, not partial performance. *P.A. Bergner*, 823 F.Supp. at 157. As Judge Mukasey stated in *Shearson Lehman*, "[t]he passing of documentation back and forth ... necessarily means that one of the parties will have to prepare and revise the draft, and that the expenditure may then benefit both parties. However, that does not change the essential character of the act. It is still merely preparatory." 710 F.Supp. at 71; *see also Ogden Martin Systems of Tulsa, Inc. v. Tri–Continental Leasing Corp.*, 734 F.Supp. 1057, 1070 (S.D.N.Y.1990) (finding that execution of trust agreement was not partial performance of proposed sale and leaseback agreement and constituted, at best, a preparatory act because trust agreement conferred no value to prospective lessee); *Shearson Lehman*, 710 F.Supp. at 71 (finding that action of brokerage house in purchasing securities to be used in securities transaction with savings and loan institution was preparatory act, not partial performance, of proposed contract to purchase residuals of collateralized mortgage obligation because securities purchase did not confer benefit on savings and loan). Accordingly, this Court finds no partial performance of the alleged contract in the instant case.

This Court also finds that the remaining factors support plaintiff's contention that

there was no intent to be bound absent a signed writing. The events comprising the facts of this case span approximately fifteen months, and the parties make no representations that time was an important factor to concluding the SMPMC transaction. In addition, as previously discussed, the parties were engaged in extensive information collecting and compiling throughout their negotiations, and many terms of the proposed SMPMC financing hinged on plaintiff's receipt and interpretation of this data. As a result, this Court finds no reason that defendants should have been expected to be bound orally, absent a detailed written agreement.

Finally, the record in this case establishes that the parties' own actions contradicted the existence of any alleged oral contract. As defendants themselves admit, they sought financing from at least one other potential lender during the time they were negotiating with plaintiff. *See* (Jorgeson Dep. at 474–76); (Chopin Dep. at 60–65.) In addition, as already discussed, there was no partial performance of the parties alleged agreement, and in fact, the parties were still engaged in extensive, substantive negotiations of major, open terms. This Court thus finds that the parties' own conduct belies the existence of any enforceable agreement between them.

### b. The Statute of Frauds

The Statute of Frauds decrees that certain promises and agreements are unenforceable absent a writing signed by the party to be charged. The New York General Obligations Law sets forth the requirements of the Statute of Frauds. Section 5–701 in relevant part provides:

> Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement or undertaking:
>
> 1. By its terms is not to be performed within one year from the making thereof
> * * *

N.Y.Gen.Oblig.Law § 5–701(a)(1). Section 5–703 in relevant part states:

> A contract to devise real property or establish a trust of real property, or any interest therein or with reference thereto, is void unless the contract or some note or memorandum thereof is in writing and subscribed by the party to be charges therewith, or by his lawfully authorized agent.

N.Y.Gen.Oblig.Law § 5–703(3).

Where the Statute of Frauds applies, the party seeking to prove that its requirements were satisfied must produce a writing signed by the party to be charged which "shall completely evidence the contract which the parties made...." *R.G. Group,* 751 F.2d at 77. Although the required memorandum may consist of several documents only some of which are signed, they must all clearly refer to the same transaction. *Id.* Moreover, "[i]f instead of proving the existence of that contract, [the documents] establish[ ] that there was in fact no contract or evidenced a contract in terms and conditions different from that which the parties entered into, it fails to comply with the statute." *Id.* at 77–78 (quoting *Poel v. Brunswick–Balke–Collender Co.,* 216 N.Y. 310, 314, 110 N.E. 619, 620 (1915)).

In the instant case, this Court finds that even if PCC did enter into an oral contract with defendants, that contract is unenforceable because it violates both of the above-quoted provisions of the Statute of Frauds. First, it is undisputed that the alleged oral contract between the parties falls within both of the above-quoted portions of the Statute of Frauds. Both parties concede that the agreement, by its plain terms, cannot be performed within one year. (Pltf.Memo at 41); *see* (Dfts.Memo at 97–100 (containing no claim that the parties' alleged oral agreement can, by its terms, be performed within one year).) The August and April Commitment letters each explicitly state that the proposed lease transaction between the parties "shall commence on the Loan Payment Commencement Date and shall be for a term of sixty (60) months." (April Commitment Letter, ¶ B.2.III); (August Commitment Letter, ¶ B.2.III.) PCC's obligation to finance the leased equipment for five years, well beyond one year, falls

within the one-year requirement of the Statute of Frauds.

It is further undisputed that Section 5–703(3) is also applicable to the parties' alleged agreement. (Pltf.Memo at 38–39); *see* (Dfts.Memo at 97–100) (containing no claim that Section 5–703 is inapplicable to the parties' alleged agreement.) New York law is "settled" and "undisputed" that an agreement to lend money which is secured by a mortgage on real property is governed by the Statute of Frauds, and therefore, must be in writing in order to be enforceable. *Roulley v. Inex Co.*, 677 F.2d 14, 15 (2d Cir.1982) (per curiam); *Sleeth v. Sampson*, 237 N.Y. 69, 142 N.E. 355 (1923); *Grimm v. Marine Midland Bank*, 117 A.D.2d 901, 498 N.Y.S.2d 591 (N.Y.App.Div.1986); N.Y.Gen. Oblig.Law § 5–703(3).

Both the August and April Commitment Letters expressly provide that PCC's financing of SMPMC would be secured by a lien on all of SMPMC's assets, including real property. (April Commitment Letter, ¶ A.5.A); (August Commitment Letter, ¶ A.5.A.) Both Commitment Letters also state that SMPMC "shall grant to [PCC] a first priority mortgage on any real property owned by [SMPMC]." (April Commitment Letter, ¶ A.5.A.); (August Commitment Letter, ¶ A.5.A.) This Court thus finds that under New York law, the transaction at issue in this litigation falls within the Statute of Frauds and requires a writing to be enforceable. *See Roulley*, 677 F.2d at 14; *Sleeth*, 237 N.Y. at 69; *Grimm*, 117 A.D.2d 901.

This Court further finds that defendants, as the party seeking to prove that the Statute of Frauds was satisfied in this case, have not produced a writing or writings signed by PCC which completely evidences the contract which the parties allegedly made. Defendants argue that four documents, taken together, contain all of the terms of the alleged agreement: (1) the approval of the transaction by PCC's President and its Credit Committee, dated July, 13, 1989; (2) the Credit Committee's memorandum to Blieberg, dated July 17, 1989; (3) the Blieberg Memo, dated July, 17, 1989; and (4) Blieberg's subsequent written reaffirmation of the existence of the transaction, dated March 27, 1990.

(Dfts.Memo at 98.) This Court finds, however, that these writings, instead of proving the existence of a contract, contradict defendants' assertions that the parties had entered into an oral contract with definite terms.

The first document defendants offer is a one-page, generic, internal memorandum, organized fill-in-the-blank style. (July 13, 1989, Memorandum ("July 1989 Memo").) Although defendants provide this Court two separate copies of this document, both are barely legible. Nevertheless, this Court discerns that plaintiffs make only four additional markings to this page, other then the fill-in-the-blank questions: (1) the name of the project, "Sugar Mill Point Medical Center"; (2) the amount of the transaction—$15.85 million, divided among the mortgage and the equipment for the project; (3) the signatures of two of three PCC Credit Committee members; and (4) the date the Committee Members signed the page. *Id.* This Court notes that the blank terms on this page include the term of the loan, the financing rate, the security, the residual, the contract structure, the type of customer, the customer's guarantors and its net worth, the customer's credit rating, and the Committee's "Final Credit Decision." *Id.* Moreover, this Court notes that the bottom of this paper states "TRANSACTION COMPLETION SUBJECT TO THE APPROVAL AND ACCEPTANCE OF ALL DOCUMENTS BY LEGAL COUNSEL." *Id.*

Defendants' second offering also is a one-page, internal-PCC memorandum which, fortunately, is legible. (Memorandum from Dawn Kelly to Wynn Blieberg, Re: Sugar Mill Point medical Center Houma, LA (Mortgage—$10,850,000 and equipment—$500,000) (July 17, 1989) ("Kelly Memo").) This memorandum was sent to Blieberg form Dawn Kelly on July 17, 1989, and states in its entirety that

> Credit has been approved under the terms set forth in the Call Report. Should the customer request any changes to these terms, please contact the legal department immediately.

*Id.* There is no "Call Report" or other documentation attached to this memo. At the

bottom of this document, in bold-face type is the statement: "TRANSACTION COMPLETION IS SUBJECT TO APPROVAL AND ACCEPTANCE OF LEGAL COUNSEL." *Id.*

The third document proffered by defendants is the Blieberg Memo. The Blieberg Memo is a "summary letter" sent from Blieberg to the PCC Legal Department, instructing the Legal Department to "prepare a commitment letter for this transaction" for transmission to Jorgeson. (Blieberg Memo at 2.) The memo further states that "[a]s previously mentioned, upon return of the commitment letter, the customer is to remit a check for $25,000 as deposit towards the one (1) percent fee." *Id.* The first page of the Blieberg Memo contains a list of seven terms for the equipment lease, and a list of eight terms for the mortgage on SMPMC. *Id.* at 1.

Finally, defendants cite to "Blieberg's subsequent written reaffirmation of the existence of the transaction and PCC's intent to be bound," and refer this Court to two separate sets of exhibits for copies of this writing. (Dfts.Memo at 98 & n. 279.) This Court's review of both sets of exhibits reveals the same document—a letter *to Blieberg* from Lloyd Ross ("Ross"), Executive Vice President of HFC, dated March 27, 1990. (Letter from Lloyd Ross, Executive Vice President, Health Finance Corporation, to Wynn Blieberg, Medical Marketing Manager, Philips Credit Corp. (Mar. 27, 1990) ("Ross Letter").) In this letter, Ross requests that Blieberg "confirm to our auditors that [PCC] ha[s] committed funding for the above lease financing transactions" so that HFC can collect its "investment banking fee." *Id.* at 1.

This Court finds that defendants' reliance on the above-described documents to satisfy the Statute of Frauds is grossly misplaced. First, three of the four documents are internal memoranda prepared by PCC in furtherance of its own decision-making process. In addition, all three plainly and explicitly contemplated that the SMPMC financing required both further documentation, and future approval by PCC legal counsel. (July 1989 Memo); (Kelly Memo); (Blieberg Memo at 2.)

Moreover, the writings are incomplete because they fail to specify numerous terms of the proposed deal which other of defendants' submissions and statements reveal to have been crucial to the transaction. Specifically, only one of the four documents cited by defendants contains more than one term of the alleged agreement. For example, taken *together,* the July 1989 Memo and the Kelly Memo reference *only one term of the project*—the dollar amount of the deal—but provide different versions of that term. The July 1989 Memo states that the amount of the SMPMC mortgage is $10,850,000, and the amount of the equipment lease is $5,000,-000, for a total deal value of $15,850,000. (July 1989 Memo.) The Kelly Memo, on the other hand, states that the amount of the SMPMC mortgage is $10,850,000, and the amount of the equipment lease is *$500,000,* for a total deal value of *$11,350,000.* (Kelly Memo.) Although the Blieberg Memo does enumerate several terms of both the lease and equipment financing, this Court notes that it does not even reference at least one item upon which defendants placed great emphasis both during contract negotiations and in this litigation—the interests, rights, and obligations of the SMPMC limited partners. Finally, the Ross letter is wholly irrelevant to the instant inquiry because it is not written or signed by an employee of PCC, and is concerned solely with HFC's ability to collect its investment banking fee, not the terms of the SMPMC financing itself.

Having thus viewed the evidence offered by defendants in support of its contention that the Statute of Frauds is satisfied in the instant case by "piecing together various writings," in the light most favorable to defendants, this Court unequivocally concludes that this evidence contradicts the existence of an oral agreement. Accordingly, this Court that there is no triable issue of fact regarding the Statute of Frauds issue, and that plaintiff is entitled to summary judgement on this basis as well.

In New York, a claim for promissory estoppel requires "a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party

asserting the estoppel by reason of his reliance." *Ripple's of Clearview, Inc. v. Le Havre Assocs.*, 88 A.D.2d 120, 452 N.Y.S.2d 447, 449 (N.Y.App.Div.1982); *see, R.G. Group,* 751 F.2d at 78. This Court finds that defendants have not shown any triable issues of fact here either. Defendants allege that PCC made fraudulent representations of its intent to be bound throughout the parties' negotiation of the SMPMC deal. (Dfts.Memo at 98–100 & n. 280.) The entire history of the parties' negotiations, however, makes it plain that any promise or agreement was conditional upon defendants signing and returning either of the Commitment Letters. Under these circumstances, this Court finds that there was never "a clear and unambiguous promise" to defendants that the SMPMC financing was secured. *See R.G. Group,* 751 F.2d at 79. Without such a promise, defendants' promissory estoppel claim must fail.

### 2. Defendants' Counterclaims

Turning finally to defendants' counterclaims, this court finds that they afford defendants no basis for recovery. To reiterate, the counterclaims defendants raise under New York law are (1) intentional misrepresentation, (Dfts.Memo at 100–107); (2) negligent misrepresentation, *id.* at 108–11, (3) promissory estoppel, *id.* at 118–120, and (4) tortious interference with business relations. *Id.* at 121–23. This Court will address each claim individually, along with plaintiff's corresponding motion for summary judgement.

### a. International Misrepresentation.

Plaintiff moves for summary judgement on defendants' first counterclaim—intentional misrepresentation. Plaintiff claims that this counterclaim suffers from a fatal flaw: "any reliance Defendants claim to have placed on Philips' alleged oral misrepresentation cannot, as a matter of law, be reasonable." (Pltf.Memo at 43.) Plaintiff explains that "the parties intended that they would be bound only by a written, fully executed contract," and "[t]hus, any 'duty' or obligation the parties may have had towards one another would spring from the commitment letters." *Id.* Plaintiff thus claims that under

these circumstances, defendants cannot rely on any oral statements made by Philips outside of the Commitment Letters, and that if defendants did rely on these letters, such reliance was unreasonable as a matter of law. *Id.* at 44. Accordingly, plaintiff moves this Court to dismiss defendants' first counterclaim. *Id.*

Defendants dispute plaintiff's position. They claim that "PCC made numerous material misrepresentations to Regent, including representations that PCC intended to honor the terms of the loan agreement approved by the PCC Credit Committee in July, 1989; that the PCC Credit Committee and its President were the persons authorized to give final approval to the transaction; and that a commitment letter would be issued, correctly, reflecting the July, 1989 terms." (Dfts.Memo at 100.) Defendants assert that "[t]hose representations were false, since persons possessing authority within PCC did not intend to honor the July 1989 terms; PCC now contends that the PCC Credit Committee and its President did not in fact have final authority over the transaction; and the commitment letter issued did not accurately and fully reflect the July 1989 terms." *Id.* at 100–01. Defendants also state "that Regent did act in reliance on PCC's repeated misrepresentations, in that Regent expended substantial sums complying with PCC's demands and did forgo other financing opportunities," *id.* at 102, and that this reliance was reasonable "because the misrepresentations were made by the President of the Corporation, by PCC's Credit Committee, and by other officers and senior personnel both before and after the August 18, 1989 draft commitment letter was issued." *Id.* at 104.

Defendants maintain that these misrepresentations state a claim for intentional misrepresentation under New York law. *Id.* at 105. They explain that "a failure to perform promises of future acts is fraudulent if the party making the promise had no intention of fulfilling its promise," and that the evidence in this case proves that PCC made its promises to defendants "with a preconceived and undisclosed intention of not performing" them. *Id.* at 105–07. Defendants argue that

this Court should thus deny plaintiff's motion for summary judgment on this claim because "[t]he Second Circuit has held that summary judgment is not appropriate on a fraudulent inducement claim." *Id.* at 105.

■ To state a claim for intentional misrepresentation under New York law, defendants must prove (1) that plaintiff made a misrepresentation (2) as to a material fact (3) which was false, (4) and known to be false by plaintiff, (5) that was made for the purpose of inducing defendants' reliance, (6) on which defendants reasonably relied, (7) in ignorance of its falsity (8) to defendants' injury. *Murray v. Xerox Corp.*, 811 F.2d 118, 121 (2d Cir.1987); *Brown v. Lockwood*, 76 A.D.2d 721, 432 N.Y.S.2d 186, 193 (N.Y.App.Div. 1980). It is a general rule that a claim of intentional misrepresentation "cannot be predicated upon statements which are promissory in nature at the time they are made and which relate to future actions or conduct," because "[m]ere unfulfilled promissory statements as to what will be done in the future are not actionable." *Brown,* 76 A.D.2d 721, 432 N.Y.S.2d at 194. An exception to this rule exists where one "makes a promise as to future action for the purpose of inducing [another] to enter into a contract and does not fulfill that promise, a party who relies thereon to his detriment may recover for fraud where he can prove that at the time the promise was made [the party who made the statement] had no intention of carrying it out." *Id.; Murray,* 811 F.2d at 121.

■ In order to meet the requirements of this exception, "it is incumbent upon [the moving party] to prove *scienter,* that is, at the time he contracted, the [promising party] had no intention of making the required loan." *Brown,* 76 A.D.2d 721, 432 N.Y.S.2d at 194. "Where the only proof is that the [promisor] failed to keep his promise, it is insufficient to establish that [he] did not intend to perform at the time the promise was made." *Id.; Lanzi v. Brooks,* 54 A.D.2d 1057, 1058, 388 N.Y.S.2d 946 (N.Y.App.Div.1976), *aff'd* 43 N.Y.2d 778, 402 N.Y.S.2d 384, 373 N.E.2d 278 (N.Y.1977). It is further clear that "[f]raudulent intent not to perform a promise cannot be inferred merely from the fact of nonperformance, and

additional proof is required." *Brown,* 76 A.D.2d 721, 432 N.Y.S.2d ·at 195 (internal citations omitted).

■ Having reviewed the various claims set forth by defendants as well as the record in this case in. the light most favorable to defendants, this Court finds no triable issues of fact exist on this claim for two reasons: (1) defendants' intentional misrepresentation claim is premised on erroneous factual assertions; and (2) even assuming the accuracy of defendants factual assertions, defendants cannot satisfy the elements of a claim for intentional misrepresentation.

This Court finds that at least two of the factual assertions upon which defendants base their intentional misrepresentation claim are inaccurate. For example, defendants' claim that PCC misrepresented its intention "to honor the terms of the loan agreement approved by the PCC Credit Committee in July 1989," (Dfts.Memo at 100), is directly contradicted by two of this Court's earlier findings. To repeat, this Court found (1) that no enforceable agreement, preliminary or otherwise, ever existed between the parties, and (2) that the documentation relating to the PCC deal generated by PCC either for internal consumption or for transmission to defendants either "expressly anticipate[d] future preparation and execution of contract documents," *Teachers Ins.,* 670 F.Supp. at 499, stated that consummation of the deal was subject to approval by PCC's Legal Department, or both. In light of these findings, this Court finds inaccurate defendants' statement that PCC misrepresented its intention to honor the July 1989 terms of the parties' alleged agreement because it is clear that all terms of the proposed agreement required the formal approval, memorialization, and adoption by the· parties, that there was no intent to be bound absent such formal approval, memorialization, and adoption, and that no formal approval, memorialization, or adoption ever occurred.

This Court similarly rejects defendants' assertion that PCC misrepresented "that the PCC Credit Committee and its President were· the. persons authorized to give final

approval to the transaction," (Dfts.Memo at 100), because correspondence addressed to defendants and submitted to this Court by defendants explicitly contradicts it. To reiterate, during the period of time between PCC's issuance of the August and April Commitment Letters, Jorgeson and Corcoran exchanged a series of letters regarding the SMPMC project. In one such letter, Jorgeson requested Corcoran's "immediate, direct, and personal involvement" in the SMPMC negotiations because Corcoran "clearly ha[d] the final decision making authority for [his] company. . . ." (September 22 Letter at 2.) In response to this statement, Corcoran addressed Jorgeson's characterization of Corcoran's role in PCC's decision-making process. Corcoran stated that he was certain that Jorgeson

> must understand from [his] current work experience and your previous work experience that *no successful business enterprise can operate successfully through a single human being and of course, PCC is no different.* What this means is that of course as President of this Corporation I have the final decision making authority and have a very positive attitude toward this project, *I delegate much of the responsibility for obtaining information and analyzing that information to trusted members of my staff* who, are fully capable of functioning in their assigned roles.

(September 28 Letter at 3 (emphasis added)).

Corcoran's statement clearly reveals that, although Corcoran possessed "final decision making authority" for PCC, individuals other than Corcoran and the members of the PCC Credit Committee were entrusted with gathering and processing the information upon which Corcoran and the Credit Committee based their lending decisions. This Court observes that Corcoran sent this explanation of PCC's decision-making process directly to Jorgeson, defendant Regent's President and CEO—a Harvard MBA and self-described experienced businessman in the fields of banking, business consulting, and hospital management, finance, and development, (Jorgeson Aff. at 3, 5–14)—during the first few months of the parties' business dealings. This Court thus finds defendants' claimed

ignorance of PCC's decision-making process to be, at best, inconsistent with defendant's own evidentiary offerings.

In addition to the inaccuracy of defendants' factual claims, this Court also finds that defendants cannot satisfy the legal elements of their intentional misrepresentation claim. As previously explained, to state a claim of intentional misrepresentation under New York law, defendants must prove that they relied on plaintiff's alleged misrepresentation, and that such reliance was reasonable. *Murray,* 811 F.2d at 121; *Brown,* 76 A.D.2d 721, 432 N.Y.S.2d at 193. This Court finds that defendants have failed to demonstrate that a triable issue of fact exists with regard to either of these elements of this cause of action.

The entirety of defendants' claim regarding reliance is as follows: "Regent did act in reliance on PCC's repeated misrepresentations, in that Regent expended substantial sums complying with PCC's demands and did forgo other financing opportunities." (Dfts.Memo at 102.) This claim is insufficient for two reasons. First, as recited in the Discussion section of this opinion, defendants *did continue* to seek financing from at least one other source, Sovran Bank, while negotiating with PCC. (Jorgeson Dep. at 474–75); (Chopin Dep. at 60–65.) Second, Regent's expenditure of time and money to comply with PCC's due diligence were merely "necessary steps taken in further of negotiation." *P.A. Bergner,* 823 F.Supp. at 157. The parties' transactional history makes clear that PCC's decision to enter into a contract with defendants was specifically conditioned on the satisfactory completion of PCC's due diligence. One of Regent's own officers concedes this fact in a letter written to a potential SMPMC investor. (Bell Letter (stating that PCC's financing commitment "is subject to the lender conducting its' [sic] due diligence").) Thus, contrary to defendants' assertion, defendants' expenditure of time and money to comply with PCC's due diligence was an essential precondition to the formation of a contract between the parties, not an effort undertaken in reliance on a promise that the contract would be concluded.

Even assuming that defendants did rely on plaintiff's alleged misrepresentations, their reliance is unreasonable as a matter of law. The record is clear that defendants and their President and CEO, Jorgeson, repeatedly were aware that the consummation of the SMPMC deal was subject to numerous conditions, to the completion of PCC's due diligence, and to the resolution of myriad unsettled terms. For example, the June 1989 Letter and the August 18 Letter from PCC to defendants expressly state that PCC's decision to finance the SMPMC project was dependent on PCC's receipt of detailed financial information and documentation regarding Regent and the SMPMC project, and that the financing, "if approved" by PCC's Credit Committee was subject to numerous terms and conditions. *See generally* (June 1989 Letter); (August 8 Letter.)

Numerous pieces of correspondence also specifically condition the completion of the SMPMC deal on the satisfactory completion of PCC due diligence, as well as on the advice of its outside consultant. For instance, in the September 28 Letter, Corcoran states that PCC's due diligence "if successfully concluded, will enable PCC to have more confidence in the economic viability of this project than we are currently able to justify based on the information currently in our possession." (September 28 Letter at 2.) Similarly, in the November 9 Letter, Corcoran informs to Jorgeson that PCC sent the information that PCC had received from defendants during due diligence "to [PCC's] outside consultants for their immediate review, and only when PCC "h[ad] feedback from [its] consultants [could it] hopefully formulate the remaining questions needed to allow [PCC] to make a final decision." (November 9 Letter at 1–2.) In addition, in a letter from Bell, Regent's Vice–President, to a potential SMPMC investor, Bell states that PCC's funding commitment to SMPMC "is subject to the lender conducting its' [sic] due diligence." (Bell Letter.)

Moreover, defendants themselves concede both that the resolution of the many unsettled terms of the SMPMC financing, and that a commitment letter containing the settled terms was necessary to the completion of the deal. Letters written by Jorgeson to Corcoran on at least five different dates spanning the course of the parties' negotiations reflect this fact: (1) the September 2 Letter (stating that there are several modifications and clarifications that [Regent] would like to see made to the commitment letter); (2) the September 20 Letter (stating that Regent faced "new, significant problems" in the contract negotiations); (3) the November 7 Letter (stating that Jorgeson ha[d] come up with a suggested modification on the handing of [limited partner] distributions that Jorgeson wanted incorporated into the transaction); (4) the April 2 Letter (expressing Regent's general "frustration over the unexplained delays in issuing the commitment letter"); and (5) the April 20 Letter (demanding a revised commitment letter including terms set forth in defendants' "Amendment" to the April Commitment Letter).

As the above-referenced documents reveal, defendants understood that the consummation of the SMPMC deal was subject to numerous conditions, to the completion of PCC's due diligence, and to the resolution of myriad unsettled terms. Moreover, most of theses documents reflect correspondence either written or received personally by Jorgeson who, as stated above, is a Harvard-trained businessman with extensive experiences in the both the finance and hospital industries. In light of both Jorgeson's training and background, and defendants' admitted awareness of each of the issues upon which they claim to have been mislead by defendants, this Court finds that any reliance defendants placed upon plaintiff's alleged misrepresentations is unreasonable as a matter of law. *See Frutico*, 833 F.Supp. at 299. Accordingly, this Court finds that no triable issue of fact exists regarding defendants' intentional misrepresentation claim, and that plaintiff is entitled to summary judgment on this issue.

### b. Negligent Misrepresentation.

Plaintiff also moves for summary judgement on defendants' counterclaim for negligent misrepresentation. Plaintiff claims that this counterclaim suffers from the same fatal

flaw as did its first: "any reliance Defendants claim to have placed on Philips' alleged oral misrepresentation cannot, as a matter of law, be reasonable." (Pltf. Memo at 43.) Plaintiff explains that "the parties intended that they would be bound only by a written, fully executed contract," and "[t]hus, any 'duty' or obligation the parties may have had towards one another would spring from the commitment letters." *Id.* Plaintiff thus claims that under these circumstances, defendants cannot rely on any oral statements made by Philips outside of the Commitment Letters, and that if defendants did rely on these letters, such reliance was unreasonable as a matter of law. *Id.* at 44. Accordingly, plaintiff moves this Court to dismiss defendants' second counterclaim. *Id.*

Defendants contest plaintiff's assertions. According to defendants, the elements of negligent misrepresentation under New York law are "(1) carelessness in imparting words, (2) upon which others were expected to rely, (3) upon which they relied, (4) to their damage, (5) expressed directly to one whom the author is bound by some relation or duty of care." (Dfts. Memo at 111.) Defendants state that "the parties had entered into a preliminary agreement with the intent to be bound prior to formalization of the agreement," and that "[t]hese oral representations evidenced by PCC's internal memorialization of the agreement, serve as basis for finding that PCC owed Regent a contractual duty to act in an accountable and responsible manner." Accordingly, defendants assert that PCC's motion for summary judgment on this claim should be denied. *Id.*

 This Court finds that plaintiff is correct in its assertion that defendants' claim for negligent misrepresentation is "fatally flawed," and that this claim should be dismissed for two reasons. First, in order to state a claim for negligent misrepresentation, defendants must prove that plaintiff misrepresented a fact. *Murray,* 811 F.2d at 123; *Frutico,* 833 F.Supp. at 300; *see Pappas v. Harrow Stores, Inc.,* 140 A.D.2d 501, 528 N.Y.S.2d 404, 407 (N.Y.App.Div.1988). "Because a negligent promissory misrepresentation is not a misrepresentation of fact, a special relationship must exist between the parties in order for a promissory misrepresentation to give rise to a justiciable claim." *Frutico,* 833 F.Supp. at 300; *see Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank,* 755 F.2d 239, 252–53 (2d Cir.), *cert. denied,* 473 U.S. 906, 105 S.Ct. 3530, 87 L.Ed.2d 654 (1985).

 The record in this case does not support the conclusion that the parties' negotiations ever ripened into either an enforceable preliminary agreement or a binding contract. Thus, because there was no enforceable contract, wither oral or written, by which PCC was to finance the SMPMC project, there was no misrepresentation on PCC's part regarding the loan. Moreover, defendants have failed to proffer any facts or evidence to establish that the requisite "special" or "fiduciary" relationship existed between PCC and defendants to assert a claim for negligent promissory misrepresentation. *See Stewart v. Jackson & Nash,* 976 F.2d 86, 90 (2d Cir.1992). The usual relationship between lender and borrower is that of debtor and creditor, *Manufacturers Hanover Trust Co. v. Yanakas,* 7 F.3d 310, 318 (2d Cir. 1993); *Durante,* 755 F.2d at 252; *Frutico,* 833 F.Supp. at 300, and defendants have not even suggested that their relationship with PCC in the instant case was otherwise.

In light of the explicit statements in the Commitment Letters and other documentation exchange by the parties during the SMPMC negotiations regarding the condition precedent of execution and delivery by the parties before a validly binding agreement would be reached regarding the loan in question, there was no misrepresentation about the time at which defendants would have an enforceable commitment from PCC. *Frutico,* 833 F.Supp. at 300. Therefore, this Court finds that PCC's motion for summary judgment as to defendants' negligent misrepresentation claim should be granted.

*c. Promissory Estoppel.*

Plaintiff seeks summary judgment on defendants' third counterclaim—promissory estoppel. Plaintiff explains that an action for promissory estoppel in New York "requires (i) a clear and unambiguous promise, (ii) reasonable and foreseeable reliance by the

promisee, and (iii) an injury sustained thereby." (Pltf.Memo at 46.) According to plaintiff, "[b]ecause the obligations of Philips and Defendants were contingent upon the formal execution of a written contract, Defendants, as a matter of law, cannot demonstrate a clear and unambiguous promise or reasonable and foreseeable reliance on that promise." *Id.*

Defendants counter that they have "adduced facts which at the very least raise genuine issues of material fact as to each of the elements of its claim of promissory estoppel." (Dfts.Memo at 120.) They aver that "[c]lear and specific representations were repeatedly made to Regent by PCC that PCC had approved the financing for the SMPMC project on the terms set forth by Mr. Blieberg in July 1989." *Id.* Defendants further maintain that "Mr. Blieberg and others at PCC represented on numerous occasions before and after August 18, 1989 that those terms would be memorialized in a written commitment letter," and that "Regent reasonably relied upon those representations...." *Id.* Based on these assertions, defendants claim that "an issue of fact exists with respect to the existence of a clear and unambiguous promise and Regent's reliance on that promise, and that plaintiff's summary judgment motion therefore should be denied." *Id.* at 121.

In New York the elements for promissory estoppel are "a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance." *Ripple's of Clearview, Inc.*, 88 A.D.2d at 122, 452 N.Y.S.2d at 449; *see R.G. Group*, 751 F.2d at 78. This Court previously found that defendants' promissory estoppel claim regarding plaintiff's Statute of Frauds defense was meritless because defendants could not show "a clear and unambiguous promise" by PCC to defendants because the entire history of the parties' negotiations made it clear that any promises or agreements made during the negotiations were conditional upon the execution and delivery of one of the Commitment Letters. *See R.G. Group*, 751 F.2d at 78–79; *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d

257, 264–65 (2d Cir.1984); *Frutico*, 833 F.Supp. at 299. Without such a promise, this Court found that defendants' promissory estoppel defense to plaintiff's assertion of the Statute of Frauds must fail. *See R.G. Group*, 751 F.2d at 78–79; *Reprosystem*, 727 F.2d at 264–65; *Frutico*, 833 F.Supp. at 299.

The substance of the instant promissory estoppel claim is identical to that raised by defendants above. *Compare* (Dfts.Memo at 98–99 & n. 280 (setting forth defendants' promissory estoppel claim regarding plaintiff's Statute of Frauds defense)) *and* (Dfts. Memo at 120–21 (setting forth defendants' promissory estoppel counterclaim).) Accordingly, this Court finds that defendants' counterclaim for promissory estoppel necessarily fails for the same reasons as those stated above, and that plaintiff is thus entitled to summary judgment on this issue.

*d. Tortious Interference with Business Relations.*

Finally, plaintiff moves for summary judgment on defendants' last remaining counterclaim for tortious interference with business relations. According to plaintiff, to state a cause of action for intentional interference with another's prospective contract, one must allege that another interfered with business relations existing between the plaintiff and a third party, "either with the sole purpose of harming the plaintiff or by means that are dishonest, unfair or in any way improper." (Pltf.Memo at 48–49.) "If the defendants' interference is intended, at least in part, to advance its own competing interests, the claim will fail unless the means employed include 'criminal or fraudulent conduct.'" *Id.* at 49.

Plaintiff asserts that relevant Second Circuit caselaw precludes defendants' claim as a matter of law. *Id.* Plaintiff states that it "asserted its right not to be bound until a written contract was duly executed," and that the Second Circuit emphasizes that this "freedom to avoid oral agreements is especially important when business entrepreneurs and corporations engage in substantial and complex dealings." *Id.* Under this framework, plaintiffs claim that defendants are "unable to allege that, by Philips' enforc-

ing its right not to be bound absent a written, signed contract, Philips' conduct was by any means 'criminal or fraudulent.'" *Id.*

Defendants' maintain that their claim for tortious interference has merit. Defendants state that they "have adduced evidence which, at a minimum, raises genuine issues of material fact with respect to each element of its claim of tortious interference." (Dfts.Memo at 122.) They claim that "Regent prepared limited partnership offerings which it circulated to physicians soliciting their investment in the SMPMC project," that approximately twenty physicians agreed to invest a total of $1 million in the project, and that "[b]ut for PCC's conduct, these physicians would have performed their contractual relationships with Regent." *Id.* Defendants further assert that certain PCC personal evinced hostility toward Regent, that "PCC has offered no privilege or justification for its conduct," and that "Regent has been harmed as a result." *Id.*

In the Second Circuit, a party asserting a claim of tortious interference with business relations under New York law must allege facts which show that the other party "interfered with business relations existing between the [complaining party] and a third party, either with the sole purpose of harming the [complaining party] or by means that are dishonest, unfair or in any other way improper." *P.A. Bergner,* 823 F.Supp. at 163. "If the ... interference is intended, at least in part, to advance [the other party's] own competing interests, the claim will fail unless the means employed include criminal or fraudulent conduct." *PPX Enterprises v. Audiofidelity Enterprises,* 818 F.2d 266, 269 (2d Cir.1987); *see Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.,* 614 F.2d 832, 838 (2d Cir.1980); *Rosenfeld v. W.B. Saunders,* 728 F.Supp. 236, 250 (S.D.N.Y.1990). Examples of the types of actions that are sufficient to state a cause of action under this tort include: (1) "directing intimidating letters and threats of punitive action" to third parties, *Marilyn Miglin, Inc. v. Gottex Indus., Inc.* 790 F.Supp. 1245, 1254 (S.D.N.Y.1992); (2) releasing a "privileged and confidential" draft employment agreement to a prospective employee, *P.A. Bergner,* 823 F.Supp. at

163; and (3) improperly using an author's name to induce contributions to the author's revised work, *Rosenfeld,* 728 F.Supp. at 150; and (4) scheming to deprive a distributor of porcelain of the fruits of its exclusive distribution contract with porcelain manufacturer by creating false commercial documents. *Schmid, Inc. v. Zucker's Gifts, Inc.,* 766 F.Supp. 118, 120–22 (S.D.N.Y.1991).

Defendants' assertions in the instant case fall far short of those needed to meet the elements of this tort. Defendants' papers are devoid of both facts and allegations that plaintiff took any action directed towards the third party in this case—the physicians who intended to become limited partners of SMPMC. Moreover, none of the accusations that defendants hurl at plaintiff rise to the level severity required to sustain the cause of action. Accordingly, this Court finds that no triable issue of fact exists on this counterclaim, and that plaintiff is entitled to summary judgment on this issue.

## CONCLUSION

IT IS HEREBY ORDERED THAT plaintiff's motion for summary judgment is GRANTED.

IT IS FURTHER ORDERED THAT plaintiff's request for an order declaring that no valid, enforceable contractual obligation exists between plaintiff and defendants is GRANTED.

IT IS FURTHER ORDERED THAT defendants' answer and counterclaims are DISMISSED.

SO ORDERED.